**RJM SALES & MARKETING, INC., Plaintiff,**

v.

**BANFI PRODUCTS CORPORATION, Defendant.**

**Civ. No. 4–81–212.**

United States District Court, D. Minnesota, Fourth Division.

Sept. 21, 1982.

David L. Black, Stacker, Ravich & Simon, St. Paul, Minn., for plaintiff.

Shaun S. Sullivan, Mark R. Kravitz, Wiggin & Dana, New Haven, Conn., and Stanford Robins, Robins, Zelle, Larson & Kaplan, Minneapolis, Minn., for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This diversity case arises out of the plaintiff's 12 count amended complaint alleging breach of contract and other causes of action. This matter is before the Court on the defendant's motion to dismiss under Rule 37 of the Federal Rules of Civil Procedure, the defendant's motion for summary judgment, and the defendant's appeal from the United States Magistrate's order granting the plaintiff leave to amend its complaint.

### FACTS

The defendant Banfi Products Corp. (Banfi) is a New York corporation engaged in the manufacture, sale, and distribution of various beverages. Banfi is also a leading importer of wines, including its popular brand Riunite. Banfi markets its wines through distributors who in turn promote and sell the wines to retailers. Banfi's distributor in Minnesota was Griggs, Cooper & Co.

The plaintiff RJM Sales & Marketing, Inc. (RJM), a Minnesota corporation, is a brokerage organization representing various beverage manufacturers. The function of a broker is to help promote and market a company's products. In the case of beverages, this role includes distributing advertising and promotional material, contacting distributors and retailers, training and educating sales personnel, and encouraging retailers to display the product prominently in their stores.

Prior to October, 1979, Banfi was dissatisfied with the sale and promotion of its products in Minnesota. It considered engaging a broker, and began discussing a contract with RJM. At this time, RJM was a broker for Glenmore Distillers, Seagrams, W.A. Taylor & Co., and Sambuca Romana. RJM had never represented a wine compa-

ny. Banfi and RJM officials discussed a target range of sales, commissions, promotional funds, and termination clauses. These negotiations culminated in a contract in the form of a letter of agreement dated October 15, 1979. The contract includes a termination clause which provides, in part:

> Either party to this agreement may terminate it by giving thirty (30) days written notice to the other party. In the event of a termination by Banfi, we will not be responsible for any damages of any nature resulting from the termination of the relationship between the parties.

In January of 1981, 15 months after the signing of the contract, Banfi terminated RJM as its broker, effective February 15, 1981.

On May 1, 1981, Banfi hired Howard Mourer to become its broker for North and South Dakota. Mourer had previously been an RJM employee, but had submitted a formal resignation to RJM on April 6, 1981, effective May 1, 1981.

RJM filed a complaint against Banfi on April 22, 1981, asserting causes of action based on the Minnesota Franchise Act, violation of FTC Franchising Rules, breach of contract, common law fraud and misrepresentation, breach of fiduciary duty, tortious interference with contract in the hiring of Mourer, and unfair competition. On July 6, 1982, some 13 months after the filing of its original complaint, but before the Magistrate's August 1, 1982, deadline for filing nondispositive motions, RJM moved to amend its complaint to allege Banfi's violation of the federal antitrust laws. The Magistrate granted RJM's motion and Banfi has appealed that order.

## DISCUSSION

### A. *Defendant's Motion to Dismiss*

██ Banfi seeks dismissal of this suit under Rule 37 of the Federal Rules of Civil Procedure based on the refusal of RJM to cooperate in discovery. The circumstances giving rise to this motion are as follows. During the December 8, 1981, deposition of RJM's president, Richard Mrocek, counsel for Banfi asked Mrocek to elaborate on certain "out of the ordinary expenses" incurred by RJM while serving as Banfi's broker. Mrocek had referred to these expenses in an earlier letter to Banfi's regional manager. Deposition of Richard Mrocek, Dec. 8, 1981, at 877–78. Mrocek responded that he had been referring to "rebates," which he defined as "money going back to the retailers for purchasing products." *Id.* at 879. When asked whether he or anyone else at RJM had ever given a rebate, Mrocek initially responded that he was "sure there have been some instances," *id.* at 880, then stated that he knew of no cash rebates given before February 15, 1981, the effective date of Banfi's termination of RJM as its broker. *Id.* at 891–92. On the advice of counsel, Mrocek refused to answer questions regarding whether rebates were given after February 15, 1981, on relevance grounds. Counsel for Banfi then made a motion before the United States Magistrate for an order compelling Mrocek to answer questions regarding rebates. The Magistrate granted that motion over RJM's relevance objections. At the reconvened deposition several months later, Mrocek again refused to answer questions regarding rebates that may have been given after February 15, 1981, asserting for the first time his fifth amendment privilege against self-incrimination.[1]

When a party or its agent refuses to comply with a discovery order, Rule 37 permits a court to "make such orders in regard to the failure as are just . . . ." Fed.R. Civ.P. 37(b)(2). Dismissal of the action is only one of several sanctions available to a court. Other sanctions include an order that matters to which the disobedient party refuses to permit discovery are taken to be established against that party, *id.* (b)(2)(A),

---

1. Mrocek was apparently advised by his counsel that providing cash inducements for the purchase of alcoholic beverages may be a crime under Minnesota law.

or an order refusing to allow the disobedient party to support designated claims, *id.* (b)(2)(B).

Banfi has cited a number of cases in which courts, under similar circumstances, have ordered dismissal on the principle that a party should not be allowed to use the shield of the fifth amendment as a sword to cut off the opposing party's access to relevant information. *E.g., Lyons v. Johnson,* 415 F.2d 540, 542 (9th Cir. 1969), *cert. denied,* 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970). Here, the Court is of the view that the extreme sanction of dismissal is not warranted at this time. Mrocek testified that he did not give any cash rebates during the period that RJM served as Banfi's broker and knew of no other RJM employee who did so. Thus, the only issue is whether Mrocek, or others, gave cash rebates after RJM had been terminated as Banfi's broker. Counsel for Banfi argued that this issue is relevant because it might affect the measure of damages, if any, to which RJM is entitled, or the availability of equitable relief.[2] This order on Banfi's motion for summary judgment disposes of many of RJM's claims for relief, however. Further, it is not yet known whether Mrocek, if called to testify at trial, would persist in claiming his fifth amendment privilege. The Court prefers to wait until trial to see what prejudice, if any, accrues to Banfi from Mrocek's invocation of his privilege. The Court will then be in a position to make such orders as are necessary to redress any prejudice suffered by Banfi.

## B. *Defendant's Motion for Summary Judgment*

Banfi has moved for summary judgment on all 12 counts of RJM's amended complaint. The various counts will be discussed separately.

### 1. *Franchise Act Claims.*

█ Counts 1, 2 and 8 of RJM's complaint arise under the Minnesota Franchise Act, Minn. Stat. § 80C.01 *et seq.* Count 1 alleges that Banfi engaged in "unfair or inequitable practices" including terminating RJM as its broker without giving 60 days notice, terminating the brokerage relationship without good cause, competing, or allowing others to compete, with RJM in the subject territory, and requiring RJM to agree to a release of damages clause, all in violation of Minn.Stat. § 80C.14 and regulations promulgated thereunder. RJM seeks an injunction under this count requiring Banfi to reinstate its contract with RJM. Count 2 alleges that Banfi failed to register the alleged franchise between Banfi and RJM with the State of Minnesota, and failed to give RJM a copy of the public offering statement required by Minn.Stat. § 80C.06, subd. 5. RJM seeks damages it believes to be in excess of $500,000 under this count; alternatively, it seeks rescission of the contract and reimbursement of its investment. In Count 8, RJM seeks a declaratory judgment that the relationship between RJM and Banfi was a franchise and was terminable only in accordance with Minn.Stat. § 80C.14 which requires 60 days notice and good cause.

Banfi contends that it is entitled to summary judgment on these three counts because its relationship with RJM did not constitute a "franchise" under Minnesota law.

The Minnesota Franchise Act defines "franchise" as:

[A] contract or agreement . . . between two or more persons:

---

**2.** Specifically, counsel for Banfi suggested that, if RJM employees were engaged in making illegal payments, RJM might not be entitled to damages for lost reputation from Banfi's alleged wrongful termination of the brokerage relationship. Similarly, counsel suggested that RJM's claim for lost profits would have to be reduced to reflect the possibility that Banfi might have learned of the illegal payments and terminated RJM as its broker. Finally, counsel contended that RJM's request for equitable relief—reinstatement or rescission of the contract—might be barred by the doctrine of unclean hands.

(1) by which a franchisee is granted the right to engage in the business of offering or distributing goods or services using the franchisor's trade name, trademark, service mark, logotype, advertising, or other commercial symbol or related characteristics;

(2) in which the franchisor and franchisee have a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise; and

(3) for which the franchisee pays, directly or indirectly, a franchise fee . . . .

Minn.Stat. § 80C.01, subd. 4. All three of the listed elements must be present for a franchise to exist. *Siedare Assocs. Inc. v. Amperex Sales Corp.,* 1981 Bus. Franchise Guide (CCH) ¶ 7732, at ₊12,861 (D.Minn. 1981).

■ Banfi argues that 1) RJM did not have the right to use Banfi's tradename; and 2) RJM paid no franchise fee. As to the first point, Banfi admits that RJM distributed advertising material that bore Banfi's tradename, but argues that this did not fulfill the first requirement of the statute because RJM was not allowed to hold itself out for business under Banfi's name. The Minnesota Supreme Court decided this exact question against Banfi's position in *Martin Investors, Inc. v. Vander Bie,* 269 N.W.2d 868, 874 (Minn.1978): "The statute requires only that the franchisee be granted the right to use the franchiser's name, not that it be permitted to hold itself out as the franchiser." Therefore, the first requirement is met.

■. The third requirement, that a franchise fee be paid, is not met. RJM maintains that three different types of expenditures it made qualify as franchise fees: 1)

payments to Banfi for wine samples and jackets; 2) payments to outside firms for signs and other advertising material; and 3) receipt of a commission on sales of Riunite that was a lower percentage than the industry average.

The first two items are nothing more than ordinary business expenses and do not constitute a franchise fee.[3] *See Siedare,* 1981 Bus. Franchise Guide (CCH) ¶ 7732, at 12,861; Minn.Stat. § 80C.01, subd. 9(e). To allow such expenditures to count as a franchise fee "would subject every [brokerage] relationship to all the requirements of the Franchise Act, a result which does not comport with the letter or the spirit of the Franchise Act." *Siedare,* 1981 Bus. Franchise Guide (CCH) ¶ 7732, at 12,861.

RJM's receipt of a three percent commission on sales of Riunite instead of the national average of five percent on other kinds of wine also does not constitute a franchise fee. Nothing in the letter of agreement between RJM and Banfi suggests that the lower commission rate was designed to serve as a franchise fee. To the contrary, the letter of agreement makes clear that RJM "will act as an *independent* contractor of Banfi . . . ." Amended Complaint, Exhibit A at 1 (emphasis added). Moreover, it is uncontested that three percent was Banfi's standard commission rate for sales of Riunite. By accepting the three percent rate, RJM did not pay "any fee or charges based upon a percentage of gross or net sales," Minn.Stat. § 80C.01, subd. 9, as RJM contends.

Since the relationship between Banfi and RJM was not a "franchise" within the definitions of section 80C.01, RJM has no causes of action under the Minnesota Franchise Act.

RJM has also alleged in Count 3 a cause of action for sale of an unregistered fran-

---

**3.** RJM cites *McDonnell v. Farmers Ins. Exchange,* Civ. No. 4–82–576, slip op. (D.Minn. May 19, 1982), an order granting a preliminary injunction, and *Schlenker v. Farm Bureau Mut. Ins. Co.,* 1982 Bus. Franchise Guide (CCH) ¶ 7840 at 13,180 (D.Minn.1982), an order denying the defendant's motion for summary judg-

ment, in support of its argument that these expenses constitute a franchise fee. The Court is not persuaded by these cases since neither case expressly held that a franchise fee existed. Moreover, the types of expenses at issue in those cases are different from the expenses at issue here.

chise in violation of 15 U.S.C. § 45 and the FTC Franchising Rule, 16 C.F.R. § 436 *et seq.* RJM now concedes that it has no private right of action under this statute and rule, and does not oppose Banfi's motion for summary judgment on Count 3.

### 2. *Breach of Contract and Unconscionability Claims.*

RJM alleges that Banfi breached its contract with RJM in three separate ways: by terminating RJM as its broker without cause, by failing to pay RJM commissions due it, and by failing to pay RJM $500 per month during June, July, August, and September as Banfi allegedly promised it would do.

#### a. *Wrongful termination.*

■ RJM contends that Banfi's termination of RJM as its broker was wrongful because Banfi had no cause to terminate the relationship. RJM concedes that the termination clause of the contract, quoted above, does not expressly require cause for termination, but maintains that the parties orally agreed at some time prior to entering the written contract that the brokerage relationship would not be terminated without cause. RJM asks the Court to consider parol evidence of this alleged agreement on the theory that the contract is incomplete or ambiguous. RJM further contends that, if the contract did not require cause for termination, the termination clause is unconscionable. RJM seeks damages under

this count for out-of-pocket expenses, lost profits, damages to reputation, and other incidental and consequential damages. Alternatively, RJM seeks rescission of the contract.

Banfi argues that the contract did not require cause for termination, and that, even if it did, Banfi had cause to terminate RJM as its broker.

■ Under Minnesota law,[4] parol evidence is inadmissible to vary the terms of a written contract, absent incompleteness or ambiguity of the contract. *Flynn v. Sawyer,* 272 N.W.2d 904, 908 (Minn.1978).

The Court has determined that the contract in this case is complete on the subject of termination. This is not a case where the contract is silent as to a disputed term. *See Bussard v. College of Saint Thomas, Inc.,* 294 Minn. 215, 200 N.W.2d 155, 162–63 (1972). Rather, the subject of termination is expressly covered by the written contract.

■ Nor is the termination clause ambiguous.[5] Whether a contractual provision is ambiguous is a question of law for the Court. *Otten v. Stonewall Ins. Co.,* 511 F.2d 143, 147 (8th Cir. 1975); *Lamb Plumbing & Heating Co. v. Kraus-Anderson, Inc.,* 296 N.W.2d 859, 862 (Minn.1980). The termination clause states: "Either party to this agreement may terminate it by giving thirty (30) days written notice to the other party." The plain meaning of these words admits of no ambiguity. Moreover, in two

---

4. The parol evidence rule is a rule of substantive law, not of evidence, in Minnesota. *Telex Corp. v. Balch,* 382 F.2d 211, 215 n.5 (8th Cir. 1967).

5. There is an apparent conflict in Minnesota case law over whether a court may consider extrinsic evidence in determining whether a contractual provision is ambiguous. The most recent case states that "[a] contract is ambiguous if it is susceptible to more than one interpretation *based on its language alone.*" *Lamb Plumbing & Heating Co. v. Kraus-Anderson, Inc.,* 296 N.W.2d 859, 862 (Minn.1980) (emphasis added). Similarly, "[e]xtrinsic evidence ... cannot be used to create an ambiguity in a

document [purchase order]." *Instrumentation Servs., Inc. v. General Research Corp.,* 283 N.W.2d 902, 908 (Minn.1979). However, RJM cites an earlier case in which the Minnesota Supreme Court stated, in a footnote: "[U]nder this view, a court need not make a preliminary determination that the language is ambiguous to permit parol evidence for the purpose of interpreting an integration." *Anderson v. Kammeier,* 262 N.W.2d 366, 370 n.2 (Minn. 1977).

The better rule is that parol evidence cannot be used to create an ambiguity in an otherwise unambiguous contract. The contrary view would make the parol evidence rule a nullity.

decisions by the United States Court of Appeals for the Eighth Circuit, similar language has been found to be unambiguous and to create a contract terminable at will. *Starling v. Valmac Indus., Inc.*, 589 F.2d 382, 387 (8th Cir. 1979); *Martin v. Equitable Life Assurance Soc'y*, 553 F.2d 573, 575 (8th Cir. 1977). The Court concludes that the termination clause is unambiguous and that Banfi did not require cause to terminate RJM as its broker.

■ Further, the termination clause is not unconscionable. Unconscionability is a question of law and may properly be decided on summary judgment. *Stanley A. Klopp, Inc. v. John Deere Co.*, 510 F.Supp. 807, 810 (E.D.Pa.1981), *aff'd mem.*, 676 F.2d 688 (3d Cir. 1982). Unconscionability has two aspects, procedural and substantive. RJM must demonstrate 1) that it had no "meaningful choice" but to deal with Banfi and accept the contract as offered, and 2) that the termination clause was "unreasonably favorable" to Banfi. *See Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 139 n.12 (5th Cir.), *cert. denied*, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979).

Neither of these elements is present here. Banfi's insistence on a 30-day termination period was apparently non-negotiable, but RJM did not have to enter into the contract. Even RJM does not allege that it was under economic duress when it made the contract. At most, it argues that "the opportunity [to take advantage of Riunite's national market power] presented no other choice than to accept the deal on Banfi's terms." RJM's Memorandum in Opposition to Banfi's Motion for Summary Judgment at 47. The facts do not indicate that Banfi had grossly superior bargaining power. RJM's

representative, Mrocek, is a person with over 15 years experience in business. Mrocek has had a great deal of experience with termination clauses of this kind; at least six previous contracts signed by Mrocek contain termination clauses nearly identical to the one at issue. Indeed, the language of the termination clause at issue originated with Mrocek. It is also significant that RJM's contract with Seagrams, executed just three weeks before the Banfi contract, expressly states that it is terminable "upon showing adequate cause." The logical inference is that the absence of such language in the Banfi contract means that the contract was terminable without cause.

The termination clause is also not "unreasonably favorable" to Banfi. The clause allowed *either* party to terminate the contract on 30 days notice. It would have permitted RJM to get out of its contract with Banfi if a more lucrative offer to become broker for one of Banfi's competitors had arisen. For these reasons that portion of the termination clause which allows either party to terminate upon 30 days notice is not unconscionable. *Accord Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 131 (5th Cir.), *cert. denied*, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979) (arbitrary termination of distributorship is permissible under Iowa law).

RJM also challenges the portion of the termination clause which limits Banfi's liability to RJM in the event of termination to commissions on RJM orders shipped within 90 days of the effective date of the termination.[6] Similar limitation of liability clauses between commercial parties have been held enforceable repeatedly. *E.g., Myers Motors v. Kaiser-Frazer Sales Corp.*, 178 F.2d 291, 303 (8th Cir. 1949); *Stanley A.*

---

**6.** The limitation of liability clause states:

In the event of a termination by Banfi, we [Banfi] will not be responsible for any damages of any nature resulting from the termination of the relationship between the parties. In the event that this agreement is terminated, Banfi agrees to pay R.J.M. its usual commissions on any orders placed by R.J.M. through the date of termination and which are shipped out of the Banfi warehouse within ninety (90) days after the effective date of the termination, or which arrive at a U.S. port within ninety (90) days from the effective date of termination, if a direct import shipment should be involved.

*Klopp, Inc. v. John Deere Co.*, 510 F.Supp. 807, 810 (E.D.Pa.1981). Although this particular clause seems to be somewhat slanted in Banfi's favor, it is not so one-sided as to be unconscionable. RJM's president signed the contract freely with full knowledge of the limitation of liability clause. In the absence of fraud or coercion, commercial parties are free to adjust the risk of loss from their joint endeavors as they see fit.

Finally, RJM argues that even if the contract did not require cause for termination, RJM was entitled, as a matter of equity, to a reasonable period of time in which to recoup its investment. RJM bases this argument on two cases, *Ag-Chem Equip. Co. v. Hahn, Inc.*, 480 F.2d 482 (8th Cir. 1973), and *McGinnis Piano & Organ Co. v. Yamaha Int'l Corp.*, 480 F.2d 474 (8th Cir. 1973). The *Ag-Chem* court described the doctrine of recoupment as follows:

> The doctrine of recoupment is designed to remedy the inequity which arises when a manufacturer, after having required a distributor to make a sizeable investment in the furtherance of a distributorship, terminates the working relationship without just cause, leaving the distributor with substantial unrecovered expenditures.

480 F.2d at 486.

Both *Ag-Chem*, involving a manufacturer-distributor relationship, and *McGinnis*, involving a franchiser-franchisee relationship, are factually distinguishable from the situation here. In both cases, the plaintiff was required to make a substantial capital investment. In contrast, counsel for RJM conceded that, with the exception of some minor advertising costs, RJM's "investment" consisted entirely of employee expense. The nature of RJM's investment makes the recoupment doctrine inapplicable to this case. According to the *Ag-Chem* court:

> Recoupment appears to have evolved from the principle that, if an agent or employee of the principal or employer furnishes a consideration *in addition to his mere services*, he will be deemed to have purchased the employment for at least a reasonable period of time where the duration of the employment is not otherwise defined.

*Id.* (emphasis added). RJM did not furnish a substantial consideration "in addition to its mere services." Further:

> Recoupment has traditionally been confined to the recovery of preliminary expenses incurred in setting up a distributorship system, such as sums expended for initial promotion and renting a facility. Thus the doctrine has envisioned a distributorship requiring one, large, initial investment.

*Id.* at 487. RJM incurred no such "preliminary expenses" when it became Banfi's broker. RJM was a going brokerage organization with an existing staff of employees. Significantly, RJM did not hire any additional employees when it took on the Banfi account. For these reasons, RJM cannot take advantage of the recoupment doctrine.

b. *Claim for unpaid commissions.*

RJM claims that it is entitled to commissions on various sales of Banfi products. First, RJM claims commissions on sales of products to Minnesota Distillers, which purchased the products from a Banfi distributor in Oklahoma and trucked them into Minnesota. Although such sales appear not to be covered by the contract, RJM alleges that Banfi orally promised to compensate RJM for such sales. Banfi denies that such a promise was made. Second, RJM claims commissions on orders placed between February 15, 1981, and February 21, 1981. Banfi contends that, since these orders were placed after the effective date of RJM's termination, RJM is not entitled to commissions. RJM argues that the effective date of termination was February 21, 1981, 30 days after it received Banfi's notice of termination. Because these claims involve genuine issues of material fact, Banfi's motion for summary judgment on

RJM's claim for unpaid commissions is denied.

### c. *Claim for $500 payments.*

RJM contends that Banfi agreed to pay $500 per month to RJM for one year as promotional fees. It is undisputed that the payments stopped after the first eight months. Banfi contends that it agreed to make the payments only until RJM began to receive commissions. Again, because of the existence of disputed material facts, Banfi's motion for summary judgment on this claim must be denied.

### 3. *Fraud and Misrepresentation Claim.*

Count 5 of RJM's amended complaint alleges that Banfi made several promises to RJM to induce it to enter into the contract and that Banfi had no intention of fulfilling those promises. Specifically RJM alleges that Banfi promised that:

1) Banfi would not terminate the agreement if RJM increased Banfi's sales volume;

2) Banfi would pay RJM $500 per month for the first year of the contract as "extra commission income";

3) Banfi would conduct extra local advertising campaigns in RJM's territory at designated times;

4) RJM would have a reasonable time to recoup its investment;

5) the sale of Banfi products in Minnesota would continually increase so that RJM's representation of Banfi would become profitable within two years; and

6) the parties' relationship would be long and profitable.

Banfi disputes whether certain of these promises were made. More importantly, it argues that RJM has no evidence that Banfi made these alleged promises without intending to fulfill them.

It is true that "a representation or expectation as to future acts is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place." *Vandeputte v. Soderholm*, 298 Minn. 505, 508, 216 N.W.2d 144, 147 (1974). Whether RJM will be able to prove at trial that Banfi's alleged promises were made with the intent to defraud RJM, is open to question. However, in another context, the Eighth Circuit has observed that "[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles." *Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 185 (8th Cir. 1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977). In addition, the Eighth Circuit recently reversed the granting of a defendant's motion for summary judgment on a fraud claim in a case involving facts similar to those presented here. *United Industrial Syndicate, Inc. v. Western Auto Supply Co.*, 686 F.2d 1312, 1317–19 (8th Cir. 1982). Accordingly, the Court denies Banfi's motion for summary judgment on RJM's fraud and misrepresentation claim. Should RJM be unable to present evidence of the requisite intent at trial, Banfi would, of course, be entitled to a directed verdict.[7] *See Northwestern State Bank v. Gangestad*, 289 N.W.2d 449, 453 (Minn.1979).

### 4. *Breach of Fiduciary Duty Claim.*

Count 6 of RJM's complaint alleges that RJM's relationship with Banfi was fiduciary, and that Banfi breached its fiduciary duties in several ways. RJM bases this claim solely on *Arnott v. American Oil Co.*, 609 F.2d 873, 881 (8th Cir. 1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980), in which the Eighth Circuit indicated that a fiduciary relation-

---

**7.** Because of the Court's ruling on RJM's fraud claim, the Court must also deny Banfi's motion for summary judgment on RJM's claim for punitive damages—Count 12 of the amended complaint. *See Olsen v. Rugloski*, 277 N.W.2d 385, 388 (Minn.1979) (punitive damages are permissible in a breach of contract action where the breach of contract is accompanied by an independent tort).

ship existed in a franchise between an oil company and its dealer.

As discussed in part B.1. above, the relationship between RJM and Banfi was not a franchise. Moreover, the Eighth Circuit has recently reconsidered *Arnott,* holding that a franchise relationship does not automatically give rise to fiduciary duties. *Bain v. Champlin Petroleum Co.,* 692 F.2d 43, 47 (8th Cir. 1982). For these reasons, the Court concludes that RJM has no cause of action for breach of fiduciary duty.

### 5. *Tortious Interference with Contract and Unfair Competition Claims.*

■ Counts 9 and 10 of RJM's amended complaint are based on Banfi's alleged hiring away of Howard Mourer, RJM's employee for North and South Dakota, to be Banfi's broker for those states. RJM alleges that Banfi tortiously interfered with RJM's contract with Mourer by procuring Mourer's resignation, and that this activity constituted unfair competition.

Mourer's employment contract with RJM was terminable at will. The prevailing rule in Minnesota and elsewhere is that one is not liable for interfering with the rights of parties to a contract that is terminable at will. *Hansen v. Barrett,* 183 F.Supp. 831, 833 (D.Minn.1960) (dictum); *see also Hollingsworth Solderless Terminal Co. v. Turley,* 622 F.2d 1324, 1337 (9th Cir. 1980); *International Election Systems Corp. v. Shoup,* 452 F.Supp. 684, 711 (E.D.Pa.1978), *aff'd mem.,* 595 F.2d 1212 (3d Cir. 1979); *Cudahy Co. v. American Laboratories, Inc.,* 313 F.Supp. 1339, 1347–48 (D.Neb.1970); Prosser, *Law of Torts,* 946 (4th ed. 1971). In some jurisdictions a cause of action nevertheless exists "if either the defecting employee or the competitor . . . is guilty of some concomitant, unconscionable conduct . . .," *Hollingsworth Solderless Terminal Co. v. Turley,* 622 F.2d 1324, 1337 (9th Cir. 1980), such as misappropriation of trade secrets, *id.* at 1337–38, enticing away the employer's customers, *International Election*

*Systems Corp. v. Shoup,* 452 F.Supp. 684, 711 (E.D.Pa.1978), *aff'd mem.,* 595 F.2d 1212 (1979), or intending to cripple the employer's business, *id.*

Counsel for RJM attempted to take advantage of this exception by arguing that Banfi's hiring of Mourer was part of a larger conspiracy or plot to terminate RJM. By hiring Mourer, counsel argued, Banfi would obtain a broker experienced in the North and South Dakota markets and be in a position to terminate its relationship with RJM. Even assuming that this was Banfi's purpose, Banfi's conduct can still not be considered "unconscionable" since, under the contract, Banfi had the right to terminate RJM as its broker at any time upon 30 days notice. *See* part B.2.a. *supra.* The Court concludes that RJM has no cause of action under Counts 9 and 10 of its complaint.

### 6. *Antitrust Claim.*

RJM's claim under the federal antitrust laws is based on allegations that, during the period that RJM was Banfi's broker, Banfi pursued a policy of tying its sales of Riunite wine to its sales of other, less popular, Banfi products. RJM alleges that for every ten cases of Riunite ordered, distributors were required to order at least one case of other Banfi wines. RJM further alleges that, when RJM failed to carry out this tying policy, Banfi terminated RJM as its broker. RJM seeks treble damages in excess of $1.5 million.

### a. *Appeal from order granting leave to amend.*

■ A preliminary issue is whether the United States Magistrate properly granted RJM's motion to amend its complaint to allege this antitrust claim. The Court has determined that the Magistrate's order was not "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A).

■ Federal Rule of Civil Procedure 15 states that leave to amend a complaint shall

be "freely given when justice so requires." Among the factors to consider in ruling on a motion to amend are undue delay on the part of the moving party and prejudice to the nonmoving party if the amendment is allowed. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

Although RJM's motion to amend came before the deadline set by the Magistrate for the filing of nondispositive motions, it appears that RJM delayed in bringing its motion. By its own admission, RJM learned of Banfi's alleged tying policy in March or April of 1981, yet did not file its motion to amend until June 9, 1982.

However, the Eighth Circuit has ruled that "[m]ere delay is not a reason in and of itself to deny leave to amend. There must be found some prejudice which would result to others if leave were to be granted." *Mercantile Trust Co. Nat'l Ass'n v. Inland Marine Products Corp.,* 542 F.2d 1010, 1012 (8th Cir. 1976) (citations omitted). Any prejudice which Banfi has suffered up until this point would not be redressed by a reversal of the order granting RJM leave to amend. Any future prejudice to Banfi will be avoided by the Court's order on Banfi's motion for summary judgment on the antitrust claim. The Magistrate's order granting RJM leave to amend its complaint is therefore affirmed.

### b. *Standing.*

■ After carefully reviewing the numerous authorities cited by the parties, the Court has determined that RJM lacks standing to pursue its antitrust claim.

■ Section 4 of the Clayton Act, 15 U.S.C. § 15 states that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained ...." Recognizing the excessive breadth of section 4's language taken literally, the Supreme Court has limited standing under section 4 to persons who can prove "antitrust injury." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). "Antitrust injury" is "injury the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Id.* "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.*

Given these principles, it is clear that RJM has not suffered antitrust injury. The situation here is analogous to that in *Bichan v. Chemetron Corp.,* 681 F.2d 514 (7th Cir. 1982), in which the court held that a salaried executive, dismissed from his job and blacklisted by the industry for refusing to comply with his company's anticompetitive policies, lacked standing to bring a private antitrust action under the Clayton Act. The Court found that since the plaintiff was not within "the area of the economy endangered by the anticompetitive scheme," the plaintiff could claim no antitrust injury. *Id.* at 517.

Similarly, in this case, Banfi's alleged tying policy was directed at its distributors, not at RJM. Any diminution of competition in the market for wine caused by the tying policy could have injured only purchasers of Banfi wines. RJM was not a purchaser. If anything, RJM would have benefited from Banfi's alleged policy of requiring distributors to order one case of non-Riunite wine for every ten cases of Riunite, since RJM's commissions were dependent upon the number of cases ordered. RJM alleges only that it was terminated for failing to carry out Banfi's tying policy not that it was harmed by any effects of Banfi's alleged anticompetitive activities in the market. This injury is simply too far removed from the type of injury which the antitrust laws were designed to prevent. *See Bichan,* 681 F.2d at 520.[8]

---

8. The cases cited by RJM in its brief are distinguishable. *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 468–69, 82 S.Ct. 486,

The Ninth Circuit recently reached a result contrary to that of *Bichan* in holding that a sales manager, dismissed for allegedly refusing to participate in his company's price-fixing conspiracy, had standing under the antitrust laws. *Ostrofe v. H. S. Crocker Co.*, 670 F.2d 1378 (9th Cir. 1982). The court's decision was based largely on the policy of providing an incentive for employees who have inside information of their employer's illegal conduct to disclose that information. *Id.* at 1384–85. The court noted that price-fixing schemes are "invariably covert," and "may go undetected by the intended victims." *Id.* at 1384.

These concerns are not present here. Banfi's alleged tying policy was not covert; rather, RJM alleges that Banfi openly required its distributors to order one case of non-Riunite wine for every ten cases of Riunite. The intended victims of this tying policy—the distributors—have more than enough incentive to sue in their own right. It is not necessary to grant RJM standing to sue on their behalf.

Finally, the Supreme Court's recent decision in *Blue Shield v. McCready*, —— U.S. ——, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), does not affect the Court's decision that RJM lacks standing. In *McCready*, the plaintiff alleged that Blue Shield reimbursed its subscribers for treatment by psychiatrists, but did not reimburse for treatment by clinical psychologists unless their treatment was supervised and billed by treating physicians. The plaintiff was treated by a psychologist and denied reimbursement by Blue Shield. The plaintiff alleged that Blue Shield's refusal to reimburse her was part of a conspiracy by Blue Shield to " 'exclude and boycott clinical psychologists from receiving compensation un-

der' the Blue Shield plans." *Id.*, 102 S.Ct. at 2544. The Court held that McCready had standing, stating:

> Denying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends. The harm to McCready and her class was clearly foreseeable; indeed, *it was a necessary step in effecting the ends of the illegal conspiracy.* Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely " 'the type of loss that the claimed violations . . . would be likely to cause.' "

*Id.*, 102 S.Ct. at 2549 (citation omitted) (emphasis added).

In contrast to the situation in *McCready,* the termination of RJM was not a "necessary step" in the implementation of Banfi's alleged tying policy. RJM did not actually write orders, it only solicited distributors and retailers to place orders. Banfi could have enforced the tying policy without RJM's participation by simply refusing to deal with distributors who did not order non-Riunite wines in the required amounts. Thus, if a tying policy did exist, RJM was merely a nonessential accessory to its fulfillment.

## CONCLUSION

Because the extent of the prejudice to Banfi from the invocation of the fifth amendment by RJM's president, Mrocek, remains unclear, the Court reserves ruling on Banfi's motion to dismiss at this time.

Upon a review of the files, records, and proceedings, and the Court being fully advised in the premises, and it appearing to the Court that the order of the United States Magistrate is not clearly erroneous

---

488–89, 7 L.Ed.2d 458 (1962); *Continental Distributing Co. v. Somerset Importers, Ltd.*, 411 F.Supp. 754, 756 (N.D.Ill.1976); and *Fleischmann Distilling Corp. v. Distillers Co.*, 395 F.Supp. 221, 228 (S.D.N.Y.1975) are all cases where the termination itself was alleged to have an anticompetitive effect on the market. In *Bravman v. Bassett Furniture Industries,*

*Inc.*, 552 F.2d 90, 100 (3d Cir.), *cert. denied,* 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977) and *DeVoto v. Pacific Fidelity Life Insurance Co.,* 516 F.2d 1, 5 (9th Cir.), *cert. denied,* 423 U.S. 894, 96 S.Ct. 194, 46 L.Ed.2d 126 (1975), the plaintiffs were found to have been injured by the effect of the defendants' anticompetitive activities on the market.

or contrary to law, pursuant to 28 U.S.C. § 636(b)(1)(A) and Local Rule 14(B), IT IS ORDERED that the order of the United States Magistrate dated June 28, 1982, granting RJM's motion to amend its complaint is affirmed.

Because no genuine issues of material fact exist, and because Banfi has shown that it is entitled to judgment as a matter of law, IT IS FURTHER ORDERED that Banfi's motion for summary judgment is granted as to Count 1, Count 2, Count 3, that portion of Count 4 which alleges termination of RJM as Banfi's broker "in bad faith and without cause and without proper written notice" (para. 29(A) of RJM's amended complaint), Count 6, Count 7, Count 8, Count 9, Count 10, and Count 11.

Because genuine issues of material fact exist, IT IS FURTHER ORDERED that Banfi's motion for summary judgment is denied as to those portions of Count 4 which allege that Banfi "[f]ailed to pay Plaintiff commissions on all sales from the subject territory" (para. 29(B) of amended complaint), and that Banfi "[f]ailed to pay plaintiff its Five Hundred Dollar ($500.00) per month payments for the months June, July, August, and September, 1980" (para. 29(C) of amended complaint), Count 5, and Count 12.