**BOAT & MOTOR MART, a corporation, Plaintiff-Appellant,**

v.

**SEA RAY BOATS, INC., a corporation, Defendant-Appellee.**

No. 86–1962.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1987.

Decided May 18, 1987.

As Amended Aug. 25, 1987.

Daniel S. Mason, San Francisco, Cal., for plaintiff-appellant.

Wynne S. Carvill, San Francisco, Cal., for defendant-appellee.

William A. Feinberg, Encino, Cal., C.M. Wendell Lee, San Francisco, Cal., Joel Zeldin, San Francisco, Cal., David Kaufmann, New York City, Mariam M. Morley, San Francisco, Cal., Gary J. Shapiro and Susan P. Strommer, Washington, D.C., for amici curiae.

Before CHAMBERS and NOONAN, Circuit Judges, and BRYAN,* District Judge.

NOONAN, Circuit Judge:

Boat & Motor, Inc. (Boat), a California corporation, appeals from summary judgment in favor of Sea Ray Boats, Inc. (Sea Ray), an Arizona corporation. Jurisdiction is based on diversity of citizenship; California law applies. We affirm the district court.

## FACTS

From 1964 until 1985 Boat sold power boats made by Sea Ray. Sea Ray is the second largest manufacturer of luxury power boats in the United States. Boat was the only dealer carrying the full Sea Ray line in the Bay Area. Since 1975, 85 percent of Boat's power boat sales were of Sea Ray boats; 15 percent of Boat's sales were of other manufacturers' power boats.

Between 1968 and 1975, Boat's relation with Sea Ray was governed by what was denominated "a Sea Ray Franchise Agreement." In 1976 Sea Ray entered into an annual agreement with Boat. The agreement in contention here ran from July 30, 1984 to August 31, 1985.

Entitled "Sea Ray Boats Direct Dealer Agreement," the agreement was a form contract prepared by Sea Ray with a space for insertion of the particular dealer. After the insertion of the dealer's name, Boat was further described in the standard contract simply as "Dealer." Sea Ray granted Dealer the right to establish and operate a dealership at 3250 Army Street, San Francisco, at 115 Embarcadero Drive, Oakland, and at Golden Gate Drive, Dublin, California to sell Monaco/Seville models, parts and accessories and various other Sea Ray products. Dealer agreed that no change in

* The Honorable Robert J. Bryan, United States District Judge for the Western District of Washington, sitting by designation.

its location would be made without the written approval of Sea Ray.

Dealer agreed "aggressively" to sell, display, advertise, and promote the Sea Ray products at the locations permitted; to achieve sales performance in accordance with reasonable sale quotas established by Sea Ray; to perform "make ready service and owner indoctrination" on Sea Ray products; and to service these products after delivery "in accordance with Sea Ray warranty and service procedures."

The agreement was with the individual dealer and was not assignable without Sea Ray's written consent. Either party was permitted to terminate without cause on 30 days' written notice. Neither party was to be liable for any loss arising out of the agreement, "all rights and claims of that nature being hereby unconditionally and irrevocably waived by both parties to this agreement."

Boat understood its obligation under the contract to sell Sea Ray "aggressively" as requiring Boat to engage in extensive advertising and promotional ventures. In compliance with this agreement, for example, Boat had formed the Sea Ray Boat Club of Northern California and continued to promote this club so that Sea Ray boat owners, once they had made their purchase, would have an incentive to use their boats. Sea Ray provided Boat with a model marketing program and provided a computer printout of prospective customers. Sea Ray's advertising agency supplied Boat with press kits, promotional tools and marketing advice. Sea Ray prevented Boat from advertising in territories assigned to other dealers. Sea Ray checked on Boat's advertising in *Bay and Delta Yachtsman.*

Sea Ray provided detailed instructions on what Boat's salesmen should do, especially at boat shows. It provided instructions how to lay out the booth, including instructions that all boats should be wiped down each day. It said that a telephone was "a must," as was a carpet. It gave detailed instructions as to other booth accessories. It insisted on a dress code for salesmen. It told Boat what to supply the salesmen with.

Sea Ray required Boat to send its salesmen for training by Sea Ray at its training schools. These salesmen were sent at the expense of Boat, which had to pay their travel, related expenses and salaries. Boat was also required at its expense to attend annual meetings of Sea Ray dealers.

Sea Ray required Boat to purchase Sea Ray films, Sea Ray video cassettes, and Sea Ray banners and posters. It also required Boat to buy floats, hats, visors, and T-shirts. It required Boat to display the Sea Ray logo. At Boat's expense the logo was painted on its sales facilities and trucks, on its business cards and its salesmen's blazers. Boat would not have been able to sell any Sea Ray boats without Sea Ray brochures to show the customers. It was essential, therefore, for Boat to buy brochures from Sea Ray.

Sea Ray monitored Boat's marketing through the use of "report cards," that is, questionnaires which asked whether a customer had received satisfactory service from the seller, whether the sales person was well informed and through what medium the customer had become aware of Sea Ray. The questionnaires were mailed to Sea Ray where they were reviewed and then sent on to Boat, frequently with additional comments by Sea Ray. Sea Ray requested explanations of negative comments from a customer. At meetings of Sea Ray dealers Sea Ray used the report cards to suggest the most effective media for advertising and promotion.

In 1984 Boat spent $90,000 in advertising, boat show and promotional expenses on behalf of Sea Ray boats.

Sea Ray provided detailed instructions for servicing Sea Ray boats. It distributed to dealers the "Sea Ray Service Manual," a set of technical and service procedures. Sea Ray issued "Infograms" to dealers which described Sea Ray service and warranty procedures and Sea Ray sent updates on technical information required for servicing Sea Ray products. Sea Ray required Boat to send its mechanics to training seminars at its plant facilities in Arizona and Florida. Boat was required to pay

the travel costs and salaries for the employees attending these seminars.

Sea Ray limited the time it allowed for warranty jobs and the rate at which the dealer would be reimbursed by Sea Ray for warranty work. Such limitations caused Boat to perform the warranty work at below cost. In 1984 Boat was reimbursed at the rate of $22 an hour, while Boat's overhead costs for its service department was $65 an hour and a head mechanic was employed by Boat at $20 per hour. In 1984, Boat performed at least 115 hours of warranty work at a substantial net loss.

Boat objected to the termination clause but was told by Sea Ray that the agreement was non-negotiable. Sea Ray also told Boat that it had nothing to worry about regarding termination. Boat was assured, "You will always be a Sea Ray Dealer."

In 1985, however, Sea Ray became dissatisfied with Boat. By letter dated April 4, 1985 Sea Ray informed Boat that when the existing agreement expired on August 31, 1985, Sea Ray would not renew the Direct Dealer Agreement. Sea Ray offered to honor existing orders through the model year and to repurchase the inventory at the end of that year. Alternatively, if Boat wanted to terminate by May 1, 1985 Sea Ray would repurchase the inventory and also pay $18,000 for expenses on current inventory.

This suit followed Sea Ray's communication to Boat.

## PROCEEDINGS

Boat brought the suit in the state court. Sea Ray removed it to the district court. Sea Ray answered and counterclaimed for breach of the agreement in that Boat had failed to sell aggressively and, as a direct result thereof, Sea Ray had been damaged in an amount exceeding $1 million. Boat filed an amended complaint with a claim for warranty service reimbursement.

On motion for summary judgment the district court granted judgment for Sea Ray, ruling that the California Franchise Relations Act did not apply to the contract between Sea Ray and Boat but that even if it did, Boat had received its sole remedy when Sea Ray repurchased the inventory. The court ruled further that the contract was not unconscionable and that Sea Ray owed no fiduciary duty to Boat or any good faith duty to renew. Boat's claim for warranty reimbursement and Sea Ray's counter claim have been dismissed by stipulation, subject to the provision that the claims may be pursued if summary judgment is not affirmed.

## ANALYSIS

We review the grant of summary judgment looking at the evidence in the light most favorable to Boat, the non-moving party. We will reverse only if there are genuine issues of material fact or errors of law. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986).

### The Applicability of the California Franchise Relations Act

The contract provisions permitting termination on 30 days written notice and expressly waiving liability for any losses arising out of the agreement would control in the absence of overriding state law. The question before us is whether the California Franchise Relations Act (the Act) is such overriding state law. To answer that question we must determine whether the Sea Ray Direct Dealer Agreement constitutes a franchise within the meaning of the California statute. To qualify as a franchise, three conditions must be met:

(a) A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; and

(b) The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and

(c) The franchisee is required to pay, directly or indirectly, a franchise fee. * * * Cal.Bus. & Prof.Code § 20001.

The act adopts as *prima facie* evidence of the definition of "franchise" the regulations and other materials issued by the Commissioner of Corporations under the Franchise Investment Law (Cal.Corp.Code §§ 31000 *et seq.*) Bus. & Prof.Code § 20009. Among those materials are the "Guidelines for Determining Whether an Agreement Constitutes a 'Franchise,'" California Department of Corporations, Release 3–F (1974). These guidelines indicate that a franchisee is one of several outlets selling a manufacturer's product; the manufacturer has "ostensibly" assumed responsibility for the outlets by causing them to be operated "with the appearance of some centralized management" and with "uniform standards as regards the quality and price of the goods sold, services rendered and other material incidents of the operation."

Sea Ray concedes that Boat used its trademark and logo and so satisfied the condition specified by section (b) of the statute. Sea Ray disputes the claim that sections (a) and (c) were also met.

■ Abstractly considered, a mere promise to sell aggressively is held by the Guidelines to be too vague to constitute a marketing plan under section (a). However, the Sea Ray Direct Dealer Agreement was specific enough in its requirement of aggressive advertising for Sea Ray to take the position that breach of this provision damaged Sea Ray in an amount exceeding $1 million. The agreement was certainly specific enough for Boat to understand that it was obliged to advertise intensively, to conduct a variety of promotions and to carry Sea Ray's array of accessory sales devices. Sea Ray makes something of the fact that Boat interpreted its instructions as to selling with the discretion warranted by Boat's long experience in the business. This exercise of discretion does not alter the fact that Boat operated within the context of Sea Ray's instructions and received its basic sales information from Sea Ray. On the evidence before us, (which of course Sea Ray could challenge if there was a trial on the merits), Boat followed a "system prescribed in substantial part" by Sea Ray and so met the condition required by section (a).

**Did Boat pay a franchise fee?** The Act itself defines such a fee as "any fee or charge that a franchisee or sub-franchisor is required to pay or agrees to pay for the right to enter a business under a franchise agreement, including, but not limited to, any such payments for such goods and services [i.e., the goods and services the franchisee has been authorized to sell]." Cal.Bus. & Prof.Code, § 20007. The charge can be required "directly or indirectly." *Id.* § 20001. The Guidelines further specify that "a payment by a franchisee, though nominally optional, may in reality be a required one, if the article for which the payment is made is essential, or if the franchisor intimates or suggests that it is essential, for the successful operation of the business." Three opinion letters of the Commissioner of Corporations repeat that purchased or promotional materials can be a franchise fee if they are required or suggested as essential. Opinion No. 71–49F, September 8, 1971; Opinion No. 73–7F, February 2, 1973; and Opinion No. 73–29F, July 18, 1973. An opinion relative to Schwinn Bicycle Company of June 19, 1978, relied on by Sea Ray, does not address the question of a franchise fee but only the existence of a marketing plan. Opinion, File No. OP 3470F, June 19, 1978.

No California judicial precedent exists interpreting the meaning of a fee in the Act. Precedent cited to us comes from other states with different statutes. Payments made to parties other than the franchisor have regularly been regarded as *not* constituting fees. *OT Industries, Inc. v. OT-Tehdas OY Santasalo-Solhberg AB,* 346 N.W.2d 162, 166–67 (Minn.App.1984). *Cf. Premier Wine & Spirits of South Dakota Inc. v. E. & J. Gallo Winery,* 644 F.Supp. 1431, 1438–39 (E.D.Cal.1986). But a payment to a manufacturer for goods or services may contain a hidden franchise fee when the price includes an overcharge. *Blanton v. Mobil Oil Corp.,* 721 F.2d 1207, 1220 (9th Cir.1983) (Washington law). Compare *RJM Sales & Marketing, Inc. v. Banfi Products Corp.,* 546 F.Supp. 1368, 1373 (D.Minn.1982).

Commentators have offered conflicting advice as to how far law should regulate a dealership as a franchise. *Compare,* Smith, *Franchise Regulation: An Analysis of State Legislation on Automobile Distribution,* 25 J.L. & Econ. 125 (1982); Fern, *The Overbroad Scope of Franchise Regulation: A Definitional Dilemma,* 34 Bus.Lawyer 1387, 1397 (1979); Santoni, *Franchising: A Critical Assessment of State and Federal Regulation,* 14 Creighton L.Rev. 67, 71–72 (1980) (all favoring free market discipline), *with* Comment, "Fairness in Franchising: The Need for a Good Cause Termination Requirement in California," 13 *U.Calif. Davis L.Rev.* 780, 782 (1980) (legislation regulating termination favored). The inconclusive debate sheds little light as we exercise our obligation to interpret the California statute in terms of which the California legislature has expressed the public policy of California. We have before us a case of first impression where our only guide is the statute and the opinions administratively issued under it.

Boat's purchases of video cassettes, films, floats, banners, posters, and brochures arguably constituted a fee in terms of the Act. All of these purchases from Sea Ray were at the behest of Sea Ray. The purchases occurred because Sea Ray asked that they be made. The purchases were all suggested by Sea Ray as essential and certainly the purchase of the brochures was essential. That they of course benefited Boat in its sales of Sea Ray is immaterial. That they were at a reasonable price is, arguably, equally so. The purchase price of "goods" bought at a bona fide wholesale price in order to start an inventory or maintain it does not constitute a franchise fee. Bus. & Prof.C. § 20007(a). But in context "goods" may mean what is distributed by the distributor, not the insignia of the franchisor. Up to $1,000 paid annually at a fair market price for "equipment or other tangible property ... necessary for the operation of the franchised business" are excluded from the definition of a fee. § 20007(e). If there were a trial, Sea Ray could show Boat's expenditure was within the exclusion. In view of this uncertainty and in the absence of California precedent on the meaning of "goods," we abstain from deciding whether a franchise fee was paid. Decision is unnecessary because Boat, even if a franchisee, has failed to prove a right to recover.

### Boat's Remedy Under the Act

Sea Ray violated the Act by not giving the 180 days' notice the Act requires a franchisor to give when it is not renewing a franchise. Bus. & Prof.Code, § 20025. The clause in the Sea Ray Direct Dealer Agreement waiving damages cannot stand if the Act creates a statutory right to damages. Civil Code § 1667; *Boatland, Inc. v. Brunswick Corp.,* 558 F.2d 818, 823 (6th Cir.1977). But does the Act create a right to damages? We address the question asking what the California Supreme Court would decide. *Molsbergen v. United States,* 757 F.2d 1016, 1020 (9th Cir.1985).

The general principle of California law is clear that there is no right without a remedy and "that an injured party shall be compensated for all damages proximately caused by the wrongdoer unless a departure from the basic principle is mandated by a legislative exception or by strong public policy." *Barbara A. v. John G.,* 145 Cal.App.3d 369, 193 Cal.Rptr. 422, 427 (1983). There is no doubt that the California legislature has determined that "franchisees are in need of special protection in dealing with franchisors." *Keating v. Superior Court,* 31 Cal.3d 584, 593–94, 183 Cal.Rptr. 360, 365, 645 P.2d 1192, 1197 (1982), *appeal denied in part and reversed in part on other grounds sub nom. Southland Corp. v. Keating,* 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). We are compelled, however, to provide the protection and to administer the remedy the California legislature has chosen to provide.

The Act provides that if a franchisor "terminates or fails to renew a franchise other than in accordance with the provisions of this chapter," the franchisor shall offer to repurchase the franchisee's inventory. Bus. & Prof.Code, § 20035. This provision provides a remedy in the event of wrongful termination or wrongful failure to renew. The remedy addresses one area

where a franchisee might suffer loss. The remedy does not speak to another significant section of the statute which requires the franchisor, during the 180 days grace period, to let the franchisee sell his business to a purchaser meeting the franchisor's requirements. Bus. & Prof.Code, § 20025(a). If the remedy of repurchase of inventory is the exclusive remedy under the Act, § 20025(a) could not be enforced. We are, however, not asked in this case to decide what should happen if § 20025(a) was violated. We can only say that it would be a different case if a franchisor both failed to give the requisite notice and prevented the franchisee from selling his business. We deal only with a case where the notice requirement was violated. The repurchase section of the statute is accompanied by another section which states, "Except as expressly provided herein, nothing in this article [Article 6. Offers to Repurchase Inventory] shall abrogate the right of a franchisee to sue under any other law." Bus. & Prof.Code § 20037. "Any other law" must refer to something other than the California Franchise Relations Act. We conclude that the Act itself provides no remedy in our case except repurchase.

Our conclusion is reinforced by inspection of the Franchises Act, dealing with franchises to sell gasoline. Here a specific section, "Civil Remedies for Violation; Time," gives a right of action for an injunction and damages against a violator and provides a particular statute of limitations to govern such actions, Bus. & Prof.Code, § 20999.3. Similarly, the Franchise Investment Act, applicable to franchises such as the one at issue here, provides remedies of damages and rescission against a violator of that statute. Corporations Code, § 31300. The legislature has known how to give damage actions to injured franchisees. In the California Franchise Relations Act it has not accorded such protection.

A further example of how a franchising act can, unlike the present one, provide a general remedy is the proposed Uniform Franchise and Business Opportunities Act (Draft, March 10, 1987). Section 506(a) af-fords a person injured by a violation of the Act "a claim for relief for damages caused by the violation, or for other appropriate relief." No such provision exists in our Act.

■ Does "any other law" give Boat a right of action? The statute defining "unlawful contracts" is applicable to the Sea Ray Direct Dealer Agreement only to the extent that the termination clause was invalid. The contract as a whole was not unlawful. Nor was the contract unconscionable. Civil Code, § 1670.5. True, the Sea Ray Direct Dealer Agreement was an adhesion contract. *Graham v. Scissor-Tail, Inc.*, 28 Cal.3d 807, 171 Cal.Rptr. 604, 610, 623 P.2d 165, 171 (1981). But such a description is the beginning not the end of analysis of a contract's enforceability. *Id.* 171 Cal.Rptr. at 611, 623 P.2d at 172. Under *Graham* we must ask if there was surprise or if the superior bargaining position of one party procured an agreement which in any terms was so oppressive or inequitable that it should be struck as a matter of law by the court.

No surprise was possible here. The contract was short. Boat was aware that it might not be renewed and that it waived all damages. Sea Ray did have a bargaining strength that was great, if not quite so great as the American Federation of Musicians in *Graham.* The power was exercised by giving Boat the contract on a take-it-or-leave-it basis. But California law itself in the California Franchise Relations Act has provided for nonrenewal of a franchisee. No unconscionability is proved by a franchisor possessing and exercising such a power. The allocation of risks by superior bargaining power is not unconscionable. The principle is one of the prevention of oppression and surprise "and not of disturbance of allocation of risks." Legislative Committee—Assembly 1979 Addition, printed after Civil Code, § 1670.5. Unlike *Graham,* the allocation of risk here was not totally one-sided. Boat, after a reasonable opportunity to adduce evidence as to the circumstances in which the contract was made, has failed to establish unconscionability as a matter of law within the standards set by *Graham, supra* and

*Perdue v. Crocker National Bank,* 38 Cal.3d 913, 925, 216 Cal.Rptr. 345, 702 P.2d 503 (1985), *appeal dismissed,* —— U.S. ——, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986).

Boat's remaining contentions are without merit. The relation between a franchisor and a franchisee is not that of a fiduciary to a beneficiary. Where a manufacturer is free to make pricing and distribution decisions for its own benefit, it is far from being a traditional trustee. *Rickel v. Schwinn Bicycle Co.,* 144 Cal.App.3d 648, 192 Cal.Rptr. 732 (1983). The California Franchise Relations Act has not imposed additional fiduciary duties on the franchisor.

Finally, Boat argues that Sea Ray breached a duty of good faith in not renewing. California law has not created such a duty in tort for failure to renew a franchise. The contract itself, except as controlled by the California Franchise Relations Act, controls as to any duty in contract. Boat fails to state a claim in either tort or contract as to a duty to renew.

AFFIRMED.