PREMIER WINE & SPIRITS OF SOUTH DAKOTA INCORPORATED, a South Dakota corporation Plaintiff,

v.

E. & J. GALLO WINERY, a foreign corporation, Defendant.

No. CV F–84–657(EDP).

United States District Court, E.D. California.

Sept. 23, 1986.

James P. Moher, Cotchett & Illston, San Mateo, Cal., Thomas J. Welk, Boyce, Murphy, McDowell & Greenfield, Sioux Falls, S.D., for the plaintiff.

D. Greg Durbin, McCormick, Barstow, Sheppard, Wayte & Carruth, Fresno, Cal., Elliot S. Kaplan, Robins, Zelle, Larson & Kaplan, Minneapolis, Mn., Jack B. Owens, Matthew Weston-Dawkes, Modesto, Cal.,

Charles R. Johnson, Johnson, Eklund & Davis, Gregory, S.D., for the defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RE ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

PRICE, District Judge.

Plaintiff, Premier Wine & Spirits of South Dakota, Incorporated (hereafter "Premier"), originally filed suit against defendant E. & J. Gallo Winery (hereafter "Gallo") stating three causes of action based on theories of breach of contract, violation of the South Dakota Franchise Act, and breach of fiduciary duty. After the case was transferred to this district, Gallo filed a motion for summary judgment on all three counts. The hearing on the motion was held in abeyance pending the Status Conference.

Premier requested permission at the Status Conference to file an Amended Complaint, and permission was subsequently given.

Premier, in its Amended Complaint filed March 25, 1985, dropped its breach of contract claim and replaced it with claims for tortious breach of the implied covenant of good faith and fair dealing and wrongful termination. Premier also added claims for violation of the California Franchise Relations Act and California Franchise Investment Law, and a claim for declaratory relief seeking to have the termination clause invalidated, as being unconscionable under California Civil Code Section 1670.5, as a matter of law. The Amended Complaint retained the causes of action for violation of the South Dakota Franchise Law and breach of fiduciary duty.

Gallo answered the Amended Complaint, denying liability and asserting a number of defenses including a change in the ownership of Premier and deficiencies in Premier's performance.

Gallo then filed a motion for summary judgment directed to all seven counts in the Amended Complaint.

The Status Conference Order in this case, filed February 28, 1985, designated a procedure for Premier to engage in discovery in preparing a reply to Gallo's motion for summary judgment. A series of letters was sent by counsel, outlining areas of discovery and this Court, by order filed June 12, 1985, permitted Premier to conduct unlimited discovery on all issues designated by it as necessary to respond to the summary judgment motion. Both parties then engaged in substantial discovery.

Premier served a second document request and second set of interrogatories and took the depositions of seven Gallo employees. Gallo served first and second sets of interrogatories and document requests and took the depositions of three of Premier's past and present principals. All the depositions, as well as the interrogatory answers have been filed with the court, together with various declarations and affidavits.

Having reviewed the moving papers and opposition on file herein and having considered the argument of counsel, the Court finds that there is no genuine dispute as to the following facts and makes the following conclusions of law.

### FINDINGS OF FACT

1. Premier is, and at all times material to this action was (a) incorporated under the laws of the State of South Dakota with its principal place of business in Mennehaha County, South Dakota; (b) licensed as a wholesaler of alcoholic beverages in the State of South Dakota; and (c) authorized to make sales of alcoholic beverages to retail licensees in South Dakota.

Premier has never been licensed as a wholesaler of alcoholic beverages in California and does not operate its business in any state other than South Dakota.

2. Gallo is, and at all times material to this action was (a) incorporated under the laws of the State of California with its principal place of business in Modesto, California, in this court district; and (b) engaged in interstate commerce with persons in South Dakota, including Premier. Gallo had as its principal business the manufacture and sale of wine and wine products to distributors such as Premier.

3. Premier first signed an Agreement of Distributorship with Gallo dated April 24, 1959. Premier and Gallo subsequently signed Agreements of Distributorship dated May 22, 1962, November 22, 1963, February 6, 1967, June 2, 1969, March 15, 1971, June 1, 1976, November 23, 1976 and October 17, 1977. Premier and Gallo have not entered into any Agreements of Distributorship after October 17, 1977.

4. Paragraph 7 of the 1977 Distributorship Agreement provides:

This instrument sets forth the entire agreement of the parties ... [N]o oral agreements or understandings varying any term, provision, covenant or condition herein shall be binding upon either party unless made in writing, and signed by duly authorized officers of both Distributor and Winery ...

5. At the time Premier and Gallo entered into these Agreements of Distributorship, Premier operated under the name Sioux Falls Wholesale Company. On August 22, 1983, Sioux Falls Wholesale Company changed its name to Premier Wine & Spirits of South Dakota.

6. When Premier's predecessor first became a distributor of Gallo products in 1959, the Gallo product line was not a large selling line. The Gallo product line began to grow in the late 1960's.

7. During the relevant time that Premier and its predecessor were distributors of Gallo products, they also distributed the products of several other wineries, including Paul Masson and Taylor California Cellars. Premier still distributes all of those other product lines. In addition, after the Agreement of Distributorship between Premier and Gallo was terminated, Heublein Wines appointed Premier as a distributor of Inglenook Wines.

8. Paragraph 2 of the 1977 Distributorship Agreement provides in pertinent part: "This agreement ... may be terminated as to all or any products by either party's giving thirty (30) days advance written no-

tice to the other party." All of the prior Distributorship Agreements included the same right of termination in favor of either party upon thirty days notice, with the exception of the 1959 Distributorship Agreement which provided for a right of termination in favor of either party upon five (5) days written notice.

9. Chester A. Mattesen, who executed eight (8) of the nine (9) Distributorship Agreements, including the 1977 Distributorship Agreement, acknowledged in his deposition that he remembered signing an agreement with a five day termination clause, and that he noticed in later agreements that the notice period was extended to 30 days. Mr. Mattesen never asked Gallo to change any of the terms of the Distributorship Agreements and never objected to Gallo regarding any of those terms.

10. Paragraph 3 of the 1977 Distributorship Agreement provides:

Upon any termination, Distributor agrees to cease holding itself out to the public as a distributor of Winery's products; to return to Winery all Winery advertising material in its possession; to pay immediately for any purchases from Winery made prior to such termination; and to sell to Winery all Winery products in Distributor's inventory that are in saleable condition, at the cost thereof to Distributor plus any alcoholic beverage taxes and freight paid by Distributor.

11. Paragraph 1(d) of the 1977 Distributorship Agreement provides that Premier will "[p]ay Winery for all purchases in accordance with the terms from time to time set by Winery". Paragraph 4 of that Agreement provides that the orders submitted by Distributor to Winery "shall be subject to Winery's acceptance at its home office in Modesto, California." The Agreement describes Premier as a "non-exclusive distributor" and further provides at paragraph 1(a) that "nothing herein limits or is intended to limit the area in which Distributor may sell said products."

12. Paragraph 8 of the 1977 Distributorship Agreement provides in part:

This agreement is entered into under the laws of the State of California and shall be construed thereunder ...

13. According to their own testimony, the management of Premier is both sophisticated and experienced. Mr. Mattesen started as President of Premier's predecessor in 1953 and was involved in the management of Premier and its predecessors on a day-to-day basis until 1970. Mr. Mattesen divested himself of his stock ownership in Premier in 1983. Mr. Gary Viger, President of Premier since 1976, has worked in the wholesale liquor industry for approximately 20 years and has extensive management experience in the wholesale liquor business. Mr. John R. McDowell, a shareholder, director and officer of Premier and its predecessor since the 1950's, is an attorney with the South Dakota firm representing Premier in this case. In addition, Mr. John R. McDowell was a spokesman for the wine industry in South Dakota as a lobbyist on behalf of the Wine Institute, and as the executive secretary and general counsel to the South Dakota Wholesale Liquor Company's Association from 1955 to 1983.

14. Premier was and is a substantial economic concern. According to the financial statement of Premier for the twelve-month period ending August 31, 1983, Premier had annual sales in excess of 8.7 million dollars, gross profits of nearly 1.3 million dollars, and a net income of more than $345,000.00.

15. Premier concedes that it paid no franchise fee to Gallo and relies solely on salary and benefits paid to its own employees in contending that it paid an indirect franchise fee.

16. Notice of termination of the 1977 Distributorship Agreement by Gallo was given by letter dated February 27, 1984, and received by Premier on February 28, 1984. The letter provides in part:

Accordingly, and notwithstanding its rights to terminate the Agreement immediately, the Winery has authorized and directed me to give you this written no-

tice, pursuant to paragraph 2 of the Agreement, that the Agreement shall be terminated 30 days after receipt of this letter. I invite your attention to paragraph 3 of the Agreement, which sets forth your company's contractual obligations upon termination.

17. In its ·Complaint, Premier alleges that the contract was terminated by Gallo because Premier refused to perform certain illegal acts, i.e, resetting dealer's shelves.

18. In his August 21, 1985 deposition, Premier's President, Gary Viger, gave the following testimony:

Q. ... What is your opinion as to why the Gallo Winery discontinued selling its product to Premier in April of '84?

A. They desired to be with Famous Brands.

Q. Do you know why the Winery desired to be with Famous Brands?

A. I have my opinions.

Q. What is your opinion?

A. Gallo is in a good number of the principal of Famous Brands house and the principal of said house is a very close personal friend to the owner of E. & J. Gallo Winery.

Q. Who is the principal you are referring to?

A. Mr. Lynn Johnson

Q. In your opinion, sir, is that the sole reason why the Gallo Winery decided to discontinue selling to Premier and move over to Famous Brands?

A. In my personal opinion, that was their goal for four years.

Q. Do you have any facts at all that you are aware of that suggest there was any other reason for Gallo's decision to move from Premier to Famous?

A. No.

Similarly, John R. McDowell, Premier's general counsel and an officer, director and shareholder of Premier since 1953, stated in his deposition that the only reason he was aware of for the termination was Gallo's desire to do business with the Johnsons (Famous Brands) and the lack of harmony between Gallo representatives and Gary Viger. Finally, Chester Mattesen, the former President of Premier who had signed the 1977 Distributorship Agreement, stated in his deposition that the only reason for the termination that he was aware of was his failure to report transfers of stock ownership in Premier and the effect of these transfers on the guaranty he had given to Gallo.

The reasons identified by the principals are in line with the reasons given by Gallo in an interrogatory answer served by Gallo.

19. Premier distributed certain Gallo products until March 28, 1984, when termination of the October 17, 1977 Distributorship Agreement became effective.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of this action pursuant to 28 U.S.C. § 1332.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) and (c).

3. On a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *See Roberts v. Continental Insurance, Co.,* 770 F.2d 853, 855 (9th Cir.1985). Summary judgment should be granted if there is no genuine issue as to any material fact and Gallo is entitled to a judgment as a matter of law. *Triangle Mining Co., Inc. v. Stauffer Chemical Co.,* 753 F.2d 734, 738 (9th Cir.1985).

4. Both California and South Dakota law enforce the choice of law provision in the Agreement of Distributorship. *See Seidman & Seidman v. Wolfson,* 50 Cal. App.3d 826, 831, 123 Cal.Rptr. 873 (1975); *Green v. Clinic Masters, Inc.,* 272 N.W.2d 813, 816 (S.D.1978). Because there is no conflict between California and South Dakota law on this issue, the Distributorship Agreement's choice of California law governs this dispute. *See S.A. Empresa De Viacao Aerea Rio Grandense v. Boeing*

Co., 641 F.2d 746, 749, 752 (9th Cir.1981); *Telco Leasing, Inc., v. Transwestern Title Co.*, 630 F.2d 691, 693 (9th Cir.1980).

5. The parties agree that California law also applies to Premier's tort claims in the first and second counts. Premier does, however, contend that South Dakota law applies to its fiduciary duty theory because of the policies enunciated in *Arnott v. American Oil Company*, 609 F.2d 873 (8th Cir.1979). Since the Court concludes below that Premier and Gallo did not stand in the relationship of franchisor-franchisee under either South Dakota or California law, and since *Arnott* applies, if at all, only to franchise relationships, the Court concludes that *Arnott* raises no material conflict between the law of South Dakota and that of California. Therefore according to California choice of law rules California law applies.

### COUNT ONE

(Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing)

6. Premier contends in Count One that the implied covenant of good faith and fair dealing requires a showing of "good cause" for termination of the 1977 Distributorship Agreement, despite the fact that the Agreement provides that either party may terminate without cause upon thirty (30) days notice.

■ 7. This Court has previously held that a good cause requirement cannot arise under the covenant of good faith and fair dealing when such a requirement would be inconsistent with the express terms of the Distributorship Agreement. *See C. Pappas Co., v. E. & J. Gallo Winery*, 610 F.Supp. 662, 665–7 (E.D.Cal.1985). Premier seeks to distinguish *Pappas* by arguing that the holding there is limited to the "contract ramifications of the covenant", while its claim here is only the "tort violation". (Opp.Bf. at 24). This Court is of the opinion that the tort claim for breach of the

covenant of good faith and fair dealing, which is more limited than the contract claim, should be governed by the same principles as the contract claim. This alone requires summary judgment against Premier's claim. However, Premier's claim must fail for the further reason that no claim for tortious violation of the covenant of good faith and fair dealing exits under California law in the context of a supplier-distributor relationship like that between Gallo and Premier.

■ 8. To establish Premier's tort claim for breach of the covenant of good faith and fair dealing, California law requires, as a threshold showing, proof of a "special relationship" between the parties characterized by elements of public interest, adhesion and fiduciary responsibility. *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.*, 36 Cal.3d 752, 768–769, 206 Cal.Rptr. 354, 686 P.2d 1158 (1984). California courts have not extended the "special relationship" doctrine to include ordinary commercial contractual relationships such as the supplier-distributor relationship present here.[1] E.g. *Quigley v. Pet, Inc.*, 162 Cal.App.3d 877, 893, 895, 208 Cal.Rptr. 394 (1984).

9. In *Wallis v. Superior Court*, 160 Cal.App.3d 1109, 207 Cal.Rptr. 123 (1984), the court listed a number of elements necessary to a "special relationship", including, among other things, requirements that the motivation for entering the contract must be a non-profit motivation. (i.e., to secure peace of mind, security or future protection) and that one party is especially vulnerable because of the type of harm it may suffer, so that it must place trust in the other party to perform. *Wallis, supra*, at page 1118, 207 Cal.Rptr. 123.

■ 10. The supplier-distributor relationship here cannot be described as having a non-profit motivation; profit is the principal basis of such a relationship. Furthermore, Premier has continued as distributor

---

**1.** *Seaman's* also recognized that tort remedies may be available for a bad faith denial of the existence of the contract. 36 Cal.3d 769, 206 Cal.Rptr. 354, 686 P.2d 1158. No such issue has been raised here.

of product lines from a multitude of suppliers, and was appointed as distributor of the Inglenook line of wines following termination. Therefore, Premier cannot be described as being especially vulnerable to a termination by Gallo.

11. Premier, in seeking tort recovery, invites this Court to ignore the warning of caution by the California Supreme Court in *Seaman's* and expand the cases of *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980) and *Cleary v. American Airlines, Inc.*, 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (1980) to ordinary commercial contracts. However, in *Consolidated Data Terminals v. Applied Digital Data Systems, Inc.*, 708 F.2d 385, 399–400, (9th Cir.1983) the Ninth Circuit cautioned the district courts not to extend the cause of action for tortious breach of covenant of good faith and fair dealing without "further guidance from the California courts concerning the scope of this potentially expansive new theory".

12. The Court therefore concludes that, based upon the undisputed facts, tort recovery is not available under California law for an alleged breach of the covenant of good faith and fair dealing in the context of a supplier-distributor relationship here presented. Accordingly, Gallo is entitled to summary judgment on Count One.

## COUNT TWO
### (Wrongful Termination)

13. Premier alleges in Count Two that it was terminated for failing to do an illegal act—resetting retailer shelves. As Premier concedes, however, Count Two is also based on a theory of tortious breach of the covenant of good faith and fair dealing.

14. The Court concludes that, for the reasons described as to Count One, *supra*, there is no triable issue of fact as to Count Two. Summary judgment for Gallo is therefore proper on Count Two as a matter of law.

15. The Courts finds further that there is no genuine dispute as to the basis for Gallo's decision to terminate the 1977 Distributorship Agreement. Premier's principals do not support the allegation that Premier was terminated for failing to violate the law, according to their own sworn testimony.

16. Premier may not now defeat summary judgment by offering inconsistent declarations creating sham issues. *See Mesirow v. Pepperidge Farm, Inc.*, 703 F.2d 339, 344 (9th Cir.1983) *cert. denied*, 464 U.S. 820, 104 S.Ct. 83, 78 L.Ed.2d 93 (1983), [affirming summary judgment for defendant; declarations submitted in opposition to summary judgment motion which contradict prior deposition testimony raise only "sham issues" and "do not create a factual dispute sufficient to avoid summary judgment"].

17. In view of the testimony of the Premier principals, this case bears out the observations of the Fifth Circuit in *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129 (5th Cir.1979). In that case, the court recognized that almost any termination without cause will be characterized as a "bad faith" termination by the dealer, and clauses permitting termination without cause "have the salutary effect of permitting parties to end a soured relationship without consequent litigation". *Id.* 138.

## COUNT THREE
### (South Dakota Franchise Act)

18. The South Dakota Franchise Act defines a franchise as any contract or agreement which exhibits the following characteristics:

(1) By which a francishee is granted the right to engage in the business of offering or distributing goods or services using the franchisor's trade name, trademark, service-mark, logo type, advertising, or other commercial symbol or related characteristics;

(2) In which the franchisor and franchisee have a community of interest in the marketing of goods and services at wholesale, retail, by lease, agreement or otherwise; and

(3) For which the franchisee is required to pay, directly or indirectly, a franchise fee. [S.D.C.L. § 37–5A–1].

19. The South Dakota Franchise Act defines a "franchise fee" as:

... any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for goods or services, or any training fees or training school fees or charges. [S.D.C.L. § 37–5A–3]

20. Under the South Dakota Franchise Act, "[t]he purchase of goods or agreement to purchase goods at a bona fide wholesale price" is not a "franchise fee".

21. Premier does not dispute that Gallo charged Premier only a "bona fide wholesale price" for goods it purchased from Gallo. Rather, Premier argues only that it hired and paid for more employees than it would have had it not been a Gallo distributor. The Court concludes that, as a matter of law, such personal expenses—not paid to Gallo—do not constitute a "franchise fee" within the meaning of the South Dakota Franchise Act.

22. While it is true that the South Dakota Franchise Act's definition of "franchise fee" does not *expressly* require that the payment be made to the franchisor, the Court concludes that under the South Dakota Franchise Act, a payment is not a "franchise fee" unless it is made to the putative franchisor. This conclusion is supported by the statutory language, the legislative intent and by judicial and other interpretations of identical statutory language in other states.

23. Section 37–5A–3 defines a franchise fee as a payment "for the right to enter into a business or to continuing a business ..." Wages and other payments to employees, while indubitably related to

the conduct of business, are not payments for the right to do business, which can only be conferred by the franchisor. Moreover, the examples of "franchise fees" listed in S.D.C.L. § 37–5A–3 all contemplate, expressly or impliedly, a payment to the franchisor.

24. Decisions interpreting the "franchise fee" provisions of the Minnesota Franchise Act (which are identical to those of the South Dakota Franchise Act, *compare* S.D.C.L. §§ 37–5A–1; 37–5A–3, *with* Minn.Stat. §§ 80C.01(4), (9), have held that payments to third parties do not constitute payment of a "franchise fee". *See, O.T. Industries, Inc. v. O.T. Tehdas OY Santasalo-Sohlberg Ab*, 346 N.W.2d 162, 166–7 (Minn.App.1984); *Accord, Schultz v. Onan Corp.*, 737 F.2d 339, 345 (3rd Cir.1984); *RJM Sales and Marketing, Inc., v. Banfi Products Corp.*, 546 F.Supp. 1368, 1373 (D.Minn.1982). To hold otherwise would be to subject all sales representative and brokerage relationships to all requirements of the Franchise Act, "a result which does not comport with the letter or the spirit of the Franchise Act". *RJM Sales and Marketing, Inc. v. Banfi Products Corp., supra*, at p. 1373.

25. The definition of "franchise fee" under the California Franchise Investment Law and the California Franchise Relations Act is virtually the same as in the South Dakota Franchise Act. *Compare* Cal.Corp. Code § 31011 and Cal.Bus. & Prof.Code § 20007 *with* S.D.C.L. § 37–5A–3. The California Commissioner of Corporations has issued "Guidelines for Determining Whether an Agreement Constitutes a 'Franchise'". In those guidelines, a franchise fee is defined to include "any fee or charge which the franchisee is required to pay to the franchisor or any affiliate of the franchisor for the right granted him to engage in business." *CCH Business Franchise Guide* ¶ 7558 at 12,351. The Guidelines state even more explicitly:

A payment to or for the account of third parties not affiliated with the franchisor is not a "franchise fee" within the meaning of Section 31011, even though the

franchisee is required by the agreement to make such payment and even if the franchisor collects it from the franchisee on behalf of a third party if such payment is not made for the right to enter into business. [*Id.* at 12,353]

█ 26. Based on the foregoing, the Court concludes that Premier's payments for personnel it contends were required to handle the Gallo product line do not constitute payment of a "franchise fee" within the meaning of the South Dakota Franchise Act. Therefore, the supplier-distributorship relationship between Gallo and Premier was not a franchise relationship under South Dakota law and Gallo is entitled to judgment on Count three as a matter of law.

## COUNT FOUR

### (Breach of Fiduciary Duty)

█ 27. Premier contends in Count Four that Gallo owed a fiduciary obligation to demonstrate good cause to terminate the 1977 Distributorship Agreement and that this obligation was breached by Gallo's termination of the Agreement. Premier does not assert that there was anything in particular about its relationship with Gallo which created a fiduciary relationship; rather, it contends that any supplier-distributor relationship is a fiduciary relationship.

28. The law of California is otherwise. *See Rickel v. Schwinn Bicycle Co.,* 144 Cal.App.3d 648, 654–5, 192 Cal.Rptr. 732 (1983) [affirming summary judgment for manufacturer; "there is no California authority applying fiduciary standards to the dealings between a manufacturer and his authorized dealers"], *See also, C. Pappas Co. v. E. & J. Gallo Winery, supra,* 610 F.Supp. at p. 667 [granting defendants' motion for summary judgment on fiduciary claim: "the underlying basis of a confidential relationship is the preclusion of any nonmutual profit arising from the dealings of the parties. Clearly, the relationship of manufacturer/distributor cannot ordinarily meet this test"]; *Gilchrist Machinery Co., Inc. v. Komatsu America Corp.,* 601

F.Supp. 1192, 1201 (S.D.Miss.1984) ["Under California law, no fiduciary duty … prevents termination without cause"].

29. No material issue of fact is raised by Premier's citation of *Arnott v. American Oil Co.,* 609 F.2d 873 (8th Cir.1979), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980). *Arnott* is plainly distinguishable because, unlike in that case, no franchise relationship existed here between Premier and Gallo. The Eighth Circuit, in its later case of *Bain v. Champlin Petroleum,* 692 F.2d 43, 48 (8th Cir.1982), confirmed the central role the franchise relationship played in its decision in *Arnott.*

30. The Court therefore concludes that, as a matter of law, there was no good cause fiduciary relationship between Premier and Gallo and that Gallo is entitled to judgment on Count Four as a matter of law.

## COUNT FIVE

### (California Franchise Relations Act)

31. Premier contends in Count Five that Gallo's termination of the Distributorship Agreement violated the California Franchise Relations Act. (Cal.Bus & Prof.Code § 20000 et seq.)

32. In order for the California Franchise Relations Act to be applicable, the Court must find, as with the South Dakota Franchise Act, that Premier paid a "franchise fee". For the reasons given as to Count Three, Gallo is entitled to judgment on Count Five as a matter of law.

█ 33. The California Franchise Relations Act does not apply to this case for a second, independent reason. By its terms, the Act applies "to any franchise where either the franchisee is domiciled in this state or the franchised business is or has been operated in this state". (Cal.Bus. & Prof.Code § 20015). It is not disputed that Premier is not domiciled in California. There is also no genuine dispute that Premier has never operated in California. For this additional reason, Gallo is entitled to judgment on Count Five as a matter of law.

## COUNT SIX

(California Franchise Investment Law)

34. Count Six was dismissed with prejudice at the hearing pursuant to the request of counsel for Premier and accordingly, Gallo is also entitled to judgment on Count Six.

## COUNT SEVEN

(Unconscionability)

35. Premier contends that the Agreement of Distributorship's provision permitting termination by either party upon 30 days notice is unconscionable and that it is entitled to a declaration that the provision is void and unenforceable on that ground.

36. California Civil Code Section 1670.5 designates that the Court shall determine a claim of unconscionability with respect to a contract or any clause of a contract. Subdivision (b) of this Section provides guidance to a court in determining a claim of unconscionability:

> (b) When it is claimed ... that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

The setting, purpose and effect of the termination clause contained in the Distributorship Agreement were expressly included in the areas of discovery permitted by the Court's order following the filing of the motion. The record reflects that substantial discovery was taken in this area with Premier conducting any discovery that it desired. Accordingly, the Court finds that the question of unconscionability is ripe for determination.

37. Under California law, a claim of unconscionability requires proof of two elements: (1) an absence of meaningful choice by one party (the "procedural" element); and (2) contract terms which are unreasonably favorable to the other party (the "substantive element"). *A & M Produce Co., v. FMC Corp.*, 135 Cal.App.3d

473, 485–86, 186 Cal.Rptr. 114 (1982). The procedural element is itself made up of two components: proof of "oppression" and "surprise". *Id.* at 486, 186 Cal.Rptr. 114. "Oppression" exists where the inequality of bargaining power between the parties results in no real negotiation and the absence of meaningful choice. *Id.* at 486, 186 Cal.Rptr. 114. "Surprise" involves the extent to which the supposedly agreed upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed forms. *Id.* at 486, 186 Cal.Rptr. 114.

38. The Court concludes that, as a matter of law, the procedure element of Premier's unconscionability claim is not satisfied. Premier was not in any way "surprised" by the 30 day termination provision, nor can it be said that the provision was the result of "oppression". The 1977 Distributorship Agreement is a one-page document and the termination provision was included in all of the Agreements of Distributorship dating back to 1961. Mr. Mattesen, who signed the 1977 Distributorship Agreement, was aware of the provision and did not object or seek to negotiate. Further, Premier has alternate product line choices available to it since it handled other lines and in fact, obtained the Inglenook product line following termination.

39. The 30-day termination is also not substantively unconscionable because it does not reallocate "the risks of the bargain in an objectively unreasonable or unexpected manner." *A. & M. Produce Co. v. FMC Corp, supra,* 135 Cal.App.3d at 487, 186 Cal.Rptr. 114. Both parties to the Agreement had the same right to terminate the Agreement without cause on 30 days notice. *See Communications Maintenance, Inc. v. Motorola, Inc.,* 761 F.2d 1202, 1209–1210 (7th Cir.1984), [upholding the district court's refusal " ... to employ the unconscionability doctrine to avoid the thirty day notice termination provision"]; *Corenswet, Inc., v. Amana Refrigeration, Inc., supra,* 594 F.2d 129, 131 [10 day termination provision not unconscionable where both parties have same rights]; *Gil-*

christ Machinery Co. v. Komatsu America Corp., supra, 601 F.Supp. at 1201 [mutual 90 day termination provision not unconscionable, particularly where plaintiff had been involved in several similar agreements]; Blalock Machinery v. Iowa Mfg., Co., 576 F.Supp. 774, 779 (N.D.Ga.1983) [termination provision giving either part right to terminate on 30 days notice was "not unreasonably favorable to the defendant"]; RJM Sales & Marketing v. Banfi Products Corp., 546 F.Supp. at 1375 [mutual 30 day termination provision not unconscionable]; Fleischmann Distilling Corp. v. Distillers Co. Ltd., 395 F.Supp. 221, 232,4 (S.D.N.Y.1975) [90 day termination provision not unconscionable].

40. This Court notes that contractual clauses permitting termination without cause upon notice advance a public policy interest. Such clauses have the salutary effect of permitting parties to end a soured relationship without consequent litigation. See Corenswet, Inc. v. Amana Refrigeration, 594 F.2d at 138.

41. Premier relies exclusively on Shell Oil v. Marinello, 63 N.J. 402, 307 A.2d 598, (1973). However, the Marinello case is distinguishable since that case involved a franchise relationship where the lease on a service station was an integral part of the franchise relationship and both were terminated. Premier, unlike the plaintiff in Marinello, was not prevented from continuing in business at its old location and would retain any goodwill which might have been developed with wine retailers through its sales force.

42. The Court concludes, therefore, that as a matter of law, the 1977 Distributorship Agreement's provision permitting termination by either party without cause upon thirty days notice is not unconscionable. Gallo is, therefore, entitled to judgment on Count Seven as a matter of law.

43. Any finding of fact which may also be incorporated as a conclusion of law is so designated, and any conclusion of law which may also be incorporated as a finding of fact is so designated.

44. Based on the foregoing, the Court directs that judgment be entered in favor of Gallo as a matter of law on all seven counts in the Amended Complaint.

45. Counsel for the defendant is ordered to lodge a form of judgment with the Court, consistent with the above Findings of Fact and Conclusions of Law within twenty (20) days of the date hereof. Counsel for the plaintiffs will have fifteen (15) days to object to the form of such judgment.