KBQ, INC., Plaintiff,

v.

**E.I. DU PONT DE NEMOURS AND COMPANY, Defendant.**

**Civil Action No. 97–40114–PBS.**

United States District Court, D. Massachusetts.

May 21, 1998.

Louisa M. Terrell, Day, Berry & Howard, Boston, MA, Keith C. Long, Warner & Stackpole, Boston, MA, for Plaintiff.

Thomas S. Vangel, Roche, Carens & De-Giacomo, Boston, MA, Susan J. Baronoff, John C. Wyman, Roche, Carens & DeGiacomo, P.C., Boston, MA, for Defendant.

### MEMORANDUM OF DECISION
### AND ORDER

SARIS, District Judge.

This is an action arising out of the termination of Plaintiff, KBQ, Inc. ("KBQ"), under a franchise agreement with Defendant, E.I. DuPont de Nemours and Co. ("DuPont"). KBQ's complaint contains two counts for breach of contract, and counts for breach of the implied covenant of good faith and fair dealing, promissory estoppel, tortious interference with an advantageous relation, breach of fiduciary duty, fraudulent misrepresentation, misappropriation of trade secrets, unconscionability, defamation, and violation of Mass.G.L. c. 93A, § 11.

DuPont has moved for summary judgment on all counts; KBQ has moved for partial summary judgment on one of the counts for breach of contract, and on the counts for fraudulent misrepresentation, misappropriation of trade secrets, and violation of c. 93A. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

After hearing, DuPont's motion is *AL-LOWED* with respect to Count I (breach of contract), Count VI (breach of fiduciary duty), and Count IX (unconscionability) and *DENIED* with respect to all other Counts. KBQ's motion is *DENIED*.

## I. FACTS

The Court treats the following facts as undisputed unless otherwise noted:

DuPont is a Delaware corporation with its principal place of business in Wilmington, Delaware. DuPont is the manufacturer of Corian® ("Corian"), a tony solid surface material used in commercial and residential kitchen and bath fixtures. DuPont sells its Corian product trough a network of authorized distributors who each cover a specified territory, or "Geographical Marketing Area" ("G.M.A."). Distributors, in turn, sell the Corian product to fabricators and dealers who must be "certified" by DuPont. Certification entitles fabricators and dealers to fabricate and/or resell the Corian product purchased from distributors.

KBQ, a Massachusetts corporation operating out of Westborough, Massachusetts, became an authorized distributor of Corian effective January 1, 1991. Prior to that, Urell's, Inc.—a company that is owned in part by KBQ's president and part-owner, Richard Douglas Urell—had been a Corian distributor since June of 1981. Mr. Urell is a college graduate who briefly attended law school.

Under their written agreement ("Distributor Agreement"), KBQ acted as a distributor for DuPont's Corian product line. KBQ was initially assigned the G.M.A. covering Massachusetts. In August 1993, DuPont assigned KBQ the G.M.A. covering the Albany, New York region as well.

In November 1994, DuPont notified KBQ of perceived problems in the staffing of KBQ. At a subsequent meeting, John Charamella, DuPont Corian's Northeast Manager of Distribution, and Paul Clegg, DuPont Corian's Regional Manager for North America, discussed the staffing issues with Urell. In that meeting, DuPont directed KBQ to hire a new residential segment manager as a solution to KBQ's staffing shortcomings. KBQ purchased approximately $3.762 million in Corian products from DuPont in 1994, which was still a 2% overall decrease from their purchases for the previous year. As directed by DuPont, KBQ hired a new residential segment manager in January 1995. At a later meeting, held in February 1995, Clegg reviewed KBQ's progress approvingly and set a growth benchmark of 18% for the coming six months. In a letter dated May 30, 1995, DuPont wrote to KBQ congratulating them for meeting the goal set in the November, 1994 meeting.

In 1995, DuPont set a 14% growth target for all distributors to reach in order to qualify for DuPont's 1995 Reward for Growth rebate program. That year, KBQ purchased approximately $4.686 million in inventory from DuPont, a 26% increase from 1994. On August 21, 1995 DuPont wrote a letter congratulating KBQ on having met or exceeded its growth objective for the year to date and invited KBQ's employees to the Ryder Cup Golf Tournament as a reward for having met the growth goal. On December 4, 1995 DuPont wrote to KBQ congratulating it on having met or exceeded it 1995 growth objective. On December 21, 1995 DuPont sent another letter to the same effect.

In 1996, DuPont again set a 14% growth target for the year. During 1996, KBQ showed slower growth in the first three quarters of the year, but by the last quarter made sufficient Corian purchases to qualify for 1996. By the end of the year, KBQ had purchased approximately $5.335 million in inventory from DuPont, an increase of 14% from the previous year's purchases. In March 1996 DuPont treated the residential sales staff to a ski weekend at Mt. Snow as a reward for KBQ's performance. On November 15, 1996, DuPont wrote to KBQ: "Congratulations on your Distributorship earning a rebate for 1996 .... We look forward to a continuing year of outstanding growth in 1997."

In late 1996, KBQ submitted to DuPont its 1997 business plans which included its 1997 Residential Business Marketing Plan, its 1997 Innovative Builder Level II Marketing Plan, its 1997 Builder Program Proposal and

its 1997 Remodeling Contractor Business Marketing Plan. The parties dispute whether or not KBQ's 1997 business plans were approved by DuPont for the use in the coming year. DuPont contends that portions of the plans were rejected as unsatisfactory, while KBQ contends that it was given the go-ahead by DuPont for the coming year.

In addition to submitting its regular business plans for the coming year, KBQ committed to participate in a three-year advertising program beginning in 1997 called "Ignition 2000." DuPont billed KBQ for the 1997 portion of the programs, an amount of $73,455. KBQ invested in an upgrade for its computer system so as to be compatible with DuPont's. Also, on March 10, 1997, KBQ hired an additional sales employee based upon DuPont's request that KBQ add a "Builder Specialist" to support the Builder and Remodeler programs at KBQ.

During the spring and summer of 1996, William Fleming, DuPont's Corian National Distribution Manager, discussed with other franchised distributors the possibility of taking over the G.M.A. then serviced by KBQ. Then, in November or December of 1996, Fleming spoke specifically with Kilstrom Distribution ("Kilstrom"), Dolan & Traynor ("Dolan") and two other adjacent distributors about the feasibility of taking over KBQ's G.M.A. On February 28, 1997, at a meeting for the North American Leadership Team for Corian, Clegg approved a proposal to terminate KBQ as a distributor. The parties, however, dispute whether such approval was conditional subject to finding suitable replacements in KBQ's G.M.A. On April 2, 1997, DuPont sent a letter to four authorized distributors officially requesting proposals for replacement in KBQ's G.M.A. Later, DuPont assigned the Massachusetts G.M.A. to Kilstrom and the Albany G.M.A. to Dolan.

On April 22, 1997, Fleming and Charamella met with Urell and delivered DuPont's written notice of termination to KBQ, effective May 25, 1997. At no time prior to the meeting was KBQ informed that DuPont was considering termination. Some time shortly thereafter, Mr. Charamella released to Kilstrom and Dolan all of the information in KBQ's 1997 business plans as well as KBQ's fabricator sales information. By the end of May 1997, KBQ's purchases from DuPont amounted to approximately $2.314 million for the year-to-date.

After giving KBQ notice, DuPont offered to repurchase all of KBQ's current inventory at current price and refund certain advertising money. There is no evidence that DuPont followed through on the performance of such an offer, or that KBQ accepted the offer.

On May 23, 1997, KBQ brought the present action in Massachusetts Superior Court by filing a twelve count everything-but-the-kitchen-sink(-and-countertop) complaint. Subsequently, the action was removed here pursuant to 28 U.S.C. § 1441. KBQ sought to reverse the termination with a motion for preliminary injunction. This Court denied that motion along with DuPont's motion to dismiss. KBQ now moves for summary judgment on four counts of the Complaint; DuPont has countered with a cross motion for summary judgment.

## II. DISCUSSION

A motion for summary judgment must be allowed if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 37 (1st Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to

return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505) (citations and footnote in *Anderson* omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

Summary judgment in favor of either party is inappropriate on several counts of the complaint due to vigorous factual disputes and that are both genuine and material. The motion is denied with respect to Counts II (good faith and fair dealing), III (promissory estoppel), V (tortious interference with advantageous relation), VII (fraudulent misrepresentation), VIII (misappropriation of trade secrets), IX (defamation), and XII (c. 93A). Two material issues of fact, among others, which are particularly hotly disputed, are worth highlighting: the date on which DuPont resolved to terminate KBQ and the reasonableness of KBQ's reliance on statements made by DuPont.

The motions as they relate to the counts for breach of contract, breach of fiduciary duty, and unconscionability merit greater discussion.

A. *Breach of Contract, Termination*

Moving for summary judgment on the breach of contract claim for termination of the distributor relationship, DuPont relies on the termination clause of the Distributor Agreement:

2. TERM/TERMINATION

A. The term of this Agreement shall be effective as of January 1, 1991, and shall continue in effect thereafter unless and until terminated by,[sic] either party, with or without cause, upon at least thirty (30) days prior written notice.

DuPont argues that this clause gives it the unrestrained right to terminate KBQ with or without cause upon at least thirty days' notice.

KBQ counters that the termination clause must be read in conjunction with other provisions of the Distributor Agreement, namely Paragraph 4, which contains the criteria by which a distributor will be evaluated,[1] and portions of Schedule E, which states that DuPont agrees to "[c]reate an environment built on trust and openness that allows for continuous improvement ,and insures long term business success." KBQ argues these provisions amount to an agreement on the part of DuPont only to terminate for failure to meet performance goals and to give KBQ an opportunity to respond to or remedy any problems which might result in termination.

■ The parties agree that, pursuant to the choice of law provision of the Distributor Agreement, KBQ's contract claims are governed by Delaware law. Because there is no compelling reason to do otherwise, this Court will "honor the parties' choice of law on all counts upon which they agree." *Steinke v. Sungard Financial Systems, Inc.*, 121 F.3d 763, 769 (1st Cir.1997). Under Delaware law, the interpretation of contract language is a question of law. *Rhone–Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del.1992). When a court interprets a contract "specific terms and exact language are given greater weight than general language." Restatement (Second) of Contracts § 203(c) (1981). Also, "express terms are given greater weight than course of performance, course of dealing, and usage of trade...." *Id.* at § 203(b).

■ Because DuPont has moved for summary judgment on this count, the Court will examine the facts and the inferences drawn therefrom in the light most favorable to KBQ. The termination provision of the Distributor Agreement is explicit: either party may terminate the agreement, with or without cause, upon notice of at least thirty days.

1. 4. BUSINESS PLAN

   The Business Plan for AUTHORIZED DISTRIBUTOR is set forth in Schedule "D" hereto. Before the commencement of every succeeding year hereunder, DU PONT and AUTHORIZED DISTRIBUTOR will agree in writing to a one (1) and five (5) year Business Plan. Du Pont will judge the performance of AUTHORIZED DISTRIBUTOR based upon compliance with Business Plan and achievement of target segment market shares in G.M.A.

Read as a whole, other provisions of the Distributor Agreement do not alter the meaning of the termination clause. The paragraph regarding DuPont's criteria for evaluation read with the general language promising to create "an environment of trust and openness" does not modify the explicitly-stated right of the parties to terminate. In fact, KBQ's interpretation would impermissibly render the termination provision meaningless. *See Seabreak Homeowners Assoc., Inc. v. Gresser,* 517 A.2d 263, 269 (Del.Ch. 1986); *see also* Restatement (Second) of Contracts § 203 comment b ("an interpretation is very strongly negated if it would render some provisions superfluous"). The proper interpretation of the agreement is that DuPont, as well as KBQ, reserved the right to terminate the relationship, with or without cause, upon notice of at least thirty days.

In the alternative, KBQ argues that the subsequent course of conduct between DuPont and KBQ modified the original agreement to the extent that, by 1997, DuPont was allowed to terminate only for cause and after reasonable notice, despite the language of the Distributor Agreement.

■ KBQ faces a difficult standard in advancing this argument. The subsequent course of conduct must be of "such specificity 'as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document.' " *Haft v. Dart Group Corp.,* 841 F.Supp. 549, 568 (D.Del.1993) (quoting *Reeder v. Sanford Sch., Inc.,* 397 A.2d 139, 141 (Del.Super.Ct.1979)). A subsequent course of conduct must explicitly address the contract provision in order to modify the parties' agreement. *Cf., e.g., Pepsi–Cola Bottling Co. v. Pepsico, Inc.,* 297 A.2d 28, 32–34 (Del.1972) (holding that acquiescence in price increases beyond the written contractual term constituted a valid modification of the contract).

■ KBQ's argument also fails as a matter of law. There is no evidence that either party explicitly expressed a desire to modify the termination clause; in fact, KBQ proffers no evidence that the provision was discussed by the parties at all. In support of its argument that the course of conduct modified the explicit termination clause of the Distributor Agreement, KBQ relies instead on several factors which deal only indirectly with the parties' termination rights. First, KBQ argues that the events of late 1994 and early 1995 where DuPont gave KBQ the opportunity to cure perceived shortcomings in staffing are evidence of an unspoken agreement to terminate only for cause and after a reasonable opportunity to respond.[2] Second, KBQ argues that the approval of KBQ's 1997 Business Plans, along with KBQ's hiring of new personnel and financial contribution to an upcoming advertising campaign, reflects DuPont's agreement that the relationship between KBQ and DuPont was secure for at least the coming year. Finally, KBQ argues that DuPont's statements of congratulation on achieving growth goals and repeated use of terms such as "partnership" and "long term relationship" manifest DuPont's agreement to more narrow termination rights. Nonetheless, the cumulative effect of this course of conduct is, as a matter of law, not sufficiently specific to modify the explicit termination provisions of the Distributor Agreement.

■ Finally, KBQ cannot avail itself of the protections of the Delaware Franchise Security Law ("DFSL"), Del.Code Ann. tit. 6, §§ 2551–2556.[3] The DFSL applies to franchised distributors "with a place of business within the State" of Delaware. *Id.* at § 2551(1). *Cf. 33 Flavors of Greater Delaware Valley, Inc. v. Bresler's 33 Flavors, Inc.,* 475 F.Supp. 217, 227–228 (D.Del.1979) (holding that franchisee who used his residence in Delaware as business office satisfies "place of business" requirement of DFSL). KBQ operates entirely in Massachusetts and New York, and has no office, residence, or other place of business in Delaware. KBQ's argument that DuPont's Corian warranty center in Delaware, for which KBQ is as-

---

2. Based on this argument, KBQ seems to imply that DuPont was obligated to terminate KBQ in late 1994 if DuPont had wanted to preserve the effectiveness of the termination clause.

3. Under the DFSL, a franchise may terminated only for "good cause" and upon at least 90 days notice. Del.Code Ann. tit. 6, § 2552(a) and § 2554.

sessed a proportionate fee, constitutes KBQ's "place of business" for purposes of the DFSL is unpersuasive.

### B. Breach of Contract, Profit Passover

■ Both parties have moved for summary judgment on Count IV of the Complaint, alleging breach of contract on the so-called "Profit Passover" clause of the Distributor Agreement:

7. PROFIT PASSOVER

It is recognized that AUTHORIZED DISTRIBUTORS bear a significant expense in complying with their duties hereunder in their respective G.M.A., including, without limitation, the duties set forth in Section 8 hereto. Accordingly in a reasonable effort to provide compensation for the accomplishment of such duties with respect to sales outside the G.M.A. the following rules shall apply:

A. For all sales by AUTHORIZED DISTRIBUTOR outside G.M.A. AUTHORIZED DISTRIBUTOR shall pay the AUTHORIZED CORIAN® DISTRIBUTOR in whose G.M.A. such sales are made, ten percent (10%) of the amount of such sales.

B. AUTHORIZED DISTRIBUTOR promptly shall provide to DU PONT notification of all Product sales outside of G.M.A., and verification of "Profit Passover" payments for such sales.

KBQ contends that DuPont is responsible for profit passover payments for Corian sales made by Kilstrom and Dolan in KBQ's former G.M.A. DuPont argues that the provision does not obligate DuPont to make such payments because the contract obliges franchised distributors to make profit passover payments to each other without DuPont's intervention.

The proper interpretation of the provision is an issue of law. *See Rhone–Poulenc,* 616 A.2d at 1195. Under Paragraph 7.A. of the Distributor Agreement, the obligation to pay the profit passover is placed on the franchised distributor. The distributor is also obligated to notify DuPont of all product sales outside of the G.M.A. and to verify profit passover payments for such sales. Though DuPont does not assume a legal obligation to make the passover pay-

ments, KBQ has a claim for breach of the contract arising from a failure to take reasonable steps to ensure such payments were made. The parties genuinely dispute whether passover payments were due and whether DuPont took reasonable steps to ensure payments were made. Factual disputes therefore preclude summary judgment on Count IV.

### C. Breach of Fiduciary Duty

DuPont has moved for summary judgment on Count VI of the Complaint, for breach of a fiduciary duty, on the grounds that no fiduciary relationship exists between the parties. KBQ argues that material facts exist as to whether DuPont obliged itself to observe a fiduciary duty.

■ The parties disagree on whether this Court should apply Massachusetts or Delaware law to KBQ's non-contractual claims. That issue, however, need not be resolved because the outcome is the same under the substantive law of either jurisdiction. *See Lambert v. Kysar,* 983 F.2d 1110, 1114 (1st Cir.1993); *see also Cohen v. McDonnell Douglas Corp.,* 389 Mass. 327, 332, 450 N.E.2d 581 (1983) ("the usual first step in applying conflict of laws principles is to determine whether there is a conflict among the laws of the various states involved.") Under both Massachusetts and Delaware law, the existence of a fiduciary relationship requires one party reposing, to a second party's knowledge, trust and confidence in the second party. *See Coca–Cola Bottling Co. v. Coca–Cola Co.,* 696 F.Supp. 57, 73 (D.Del.1988); *see also Burns v. Massachusetts Institute of Technology,* 394 F.2d 416, 419 (1st Cir.1968). Typically, fiduciary obligations inhere where one party has a voice in the management of the affairs of another, where two entities are engaged in a joint venture where they share profits and risks, or where the entities jointly own or control assets. *See Coca–Cola Bottling Co.,* 696 F.Supp. at 74. A disparity in bargaining power alone will not suffice to create a fiduciary obligation flowing to the party with superior bargaining strength. *Id.* at 75.

Ordinarily, a franchise relationship such as the one between DuPont and KBQ does not create fiduciary duties. *See, e.g., id.* at 73–75 (holding that soft drink manufacturer did not owe fiduciary duty to franchised distributors). Nor, in the present case, are the traditional indicia of a fiduciary relationship present. Though DuPont exercises some voice in the management of its distributors, DuPont's growth and staffing requirements do not rise to the level required to create fiduciary obligations. *See id.* (holding franchisor's exercise of "some control" over franchisee's affairs does not create fiduciary duties). Moreover, DuPont and KBQ do not share risk or profits, nor do they jointly own or control assets. KBQ therefore lacks a factual or legal basis to support a claim that DuPont breached a fiduciary duty.

KBQ argues that disputed issues of material fact exist because DuPont may have created a fiduciary duty by frequently referring to the "partnership" that existed between DuPont and its franchised distributors. Mere reference to a "partnership" does not, however, create a fiduciary relationship. *See id.* at 74 ("By referring to the relationship that existed between [the distributors] and the Company as a 'special partnership,' the Company has not created a legal partnership with associated fiduciary duties.").

D. *Unconscionability*

DuPont has moved for summary judgment on Count IX, for unconscionability, on the grounds that KBQ cannot proffer sufficient evidence in support of the claim. KBQ argues that the count cannot be resolved on summary judgment because the parties dispute material issues of fact.

A party seeking to show that an agreement is unconscionable under Massachusetts or Delaware law must show that, at the time the agreement was formed, there was an absence of meaningful choice and the contract terms unreasonably favor one party. *Tulowitzki v. Atlantic Richfield Co.*, 396 A.2d 956, 960 (Del.1978); *cf. Waters v. Min Ltd.*, 412 Mass. 64, 68, 587 N.E.2d 231 (1992) ("Unconscionability must be determined on a case-by-case basis, with particular attention to whether the challenged provision could result in oppression and unfair surprise to the disadvantaged party"). That is, a contract is unconscionable if it is "such as no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept on the other." *Tulowitzki*, 396 A.2d at 960. A party seeking to demonstrate unconscionability in a commercial setting has a heavy burden of proof. *Pig Improvement Co., Inc. v. Middle States Holding Co.*, 943 F.Supp. 392, 402 (D.Del.1996); *cf. Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F.Supp. 363, 375 (D.Mass.1991) ("the doctrine of unconscionability is not typically applied to commercial dealings between business entities"). Additionally, mere disparity in bargaining power will not support a finding of unconscionability. *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 912 (Del. 1989).

Viewed in the light most favorable to KBQ, there is no evidence that the contract meets the legal standard of unfairness required for unconscionability. Mr. Urell has operated a business as a franchised distributor for at least sixteen years, and he is a college graduate who briefly attended law school. There are no facts which suggest that Mr. Urell is an unsophisticated businessman or that he did not understand the meaning of the termination clause. The termination clause is neither buried in the contract nor obscurely phrased. In short, KBQ can offer no evidence that he was unfairly surprised by the existence of the termination clause. By the same token, KBQ can offer no evidence, such as standard industry practice, that the clause was oppressively one-sided. The termination clause allowed both parties equal termination rights. Courts have generally held that termination provisions similar to this one are not unconscionable. *See, e.g., Communications Maintenance, Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1209–1210 (7th Cir.1985) (holding franchise agreement's provision allowing termination by either party without cause upon thirty days notice is not unconscionable); *Premier Wine & Spirits of South Dakota, Inc. v. E. & J. Gallo Winery*, 644 F.Supp. 1431, 1440 (E.D.Cal.1986) (same);

*M.I.L. Elecs., Inc. v. Matsushita Elec. Corp. of America, Inc.*, 1995 WL 809537 at * 3 (Mass.Super. Ct. June 15, 1995) (same). In fact, KBQ's contentions of manifest unfairness at the time the contract was formed are belied by the fact that KBQ operated successfully for several years as a Corian distributor under the complained of contract. Summary judgment in favor of DuPont is therefore appropriate on this Count.

### III.  ORDER

The motion of Defendant E.I. DuPont De Nemours and Co. for summary judgment (Docket No. 57) is **ALLOWED** with respect to Counts I, VI, and IX of the Complaint and **DENIED** with respect to all other counts. The Plaintiff KBQ's Motion for Partial Summary Judgment (Docket No. 60) is **DENIED**.